State v. W. Sky Fin., LLC, 2015 NCBC 84.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| COUNTY OF WAKE | 13 CVS 16487 |

| | | |
|---|---|---|
| STATE OF NORTH CAROLINA, *ex rel.* | ) | |
| ROY COOPER, Attorney General and RAY | ) | |
| GRACE, Commissioner of Banks, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| WESTERN SKY FINANCIAL, LLC; | ) | |
| CASHCALL, INC.; WS FUNDING, LLC; | ) | |
| DELBERT SERVICES CORPORATION; and | ) | |
| JOHN PAUL REDDAM, | ) | |
| Defendants. | ) | |

THIS CAUSE, designated a mandatory complex business case by Order of the Chief Justice of the North Carolina Supreme Court, pursuant to N.C. Gen. Stat. § 7A-45.4(b) (hereinafter, references to the North Carolina General Statutes will be to "G.S."), and assigned to the undersigned Special Superior Court Judge for Complex Business Cases, comes before the Court upon Defendants' Motion to Dismiss pursuant to Rule 12 of the North Carolina Rules of Civil Procedure ("Rule(s)") ("Defendants' Motion") and Plaintiff's Motion for Preliminary Injunction ("Plaintiff's Motion") (collectively, "Motions"). On June 8, 2015, the Court held a hearing on the Motions.

THE COURT, after considering the Motions, the briefs in opposition to and in support thereof, arguments of counsel, and other appropriate matters of record, CONCLUDES as stated herein.

*Office of the Attorney General of the State of North Carolina by William v. Conley, Esq. and B. Carrington Skinner IV, Esq., and North Carolina Commissioner of Banks by John R. Green, Jr., Esq., for the State of North Carolina.*

*Womble Carlyle Sandridge & Rice, LLP by The Honorable Burley B. Mitchell, Jr., Hayden J. Silver III, Esq., Raymond M. Bennett, Esq. and James P. Cooney III, Esq., for Defendants.*

McGuire, Judge.

## PROCEDURAL BACKGROUND

1. On December 16, 2013, Plaintiff initiated this case by filing its Complaint with the Wake County Clerk of Court. Plaintiff alleges that the Defendants have collaborated in a scheme to make usurious loans to North Carolina consumers, in violation of North Carolina law, and claim to be immune from State law as Native American tribal entities. The Complaint alleges claims against Defendants for Violations of the North Carolina Consumer Finance Act, Violations of the North Carolina Usury Statute, and Violations of the North Carolina Unfair and Deceptive Trade Practices Act. As part of Plaintiff's requested relief, Plaintiff seeks prohibitory and mandatory injunctions on Defendants.

2. On January 17, 2014, this case was designated to the North Carolina Business Court.

3. On March 24, 2015, Defendants filed their Motion to Dismiss.[1] The Defendants move to dismiss Plaintiff's Complaint on the grounds that the Court lacks jurisdiction over the claims in this case because "North Carolina does not have the power to regulate the conduct at issue in this case, which occurred within the Cheyenne River Sioux Tribe [ ] Reservation in South Dakota."[2] Defendants further contend that the State's attempt to regulate the conduct at issue violates the Dormant Commerce Clause, that the Court lacks personal jurisdiction over Defendant John Paul Reddam ("Reddam"), and that the certain claims raised by the Complaint for violation of the usury statute and the Unfair and Deceptive Trade Practices Act ("UDTPA") fail to state a claim upon which relief may be granted.[3]

---

[1] From approximately February 2014 to January 2015, the parties obtained multiple extensions of time to file responsive pleadings and conduct a case management meeting, based on the parties' representation that they were engaged in settlement discussions. The case was effectively stayed during this time period. The parties did not reach a settlement.

[2] Mot. Dismiss ¶ 1.

[3] *Id.* ¶¶ 2-4.

4. On March 24, 2015, Plaintiff also filed the Motion for Preliminary Injunction. The Plaintiff's Motion requests an order from this Court prohibiting Defendants from, *inter alia*, advertising, soliciting for, offering, servicing, collecting payment from, or selling or transferring any loans with North Carolina borrowers. The Plaintiff's Motion further seeks an order prohibiting Defendants from "[t]ransferring, withdrawing, concealing, or encumbering any assets outside of [Defendants'] normal course of business." The Plaintiff's Motion also seeks an order requiring Defendants to produce certain financial and institutional information regarding loans issued to North Carolina consumers within the past six years. Finally, Plaintiff seeks an order requiring Defendants to establish an escrow account to pay full restitution to all affected consumers.

5. The Motions have been briefed and argued and are ripe for determination.

## FACTUAL BACKGROUND

6. Plaintiff is the State of North Carolina, acting through the Attorney General and the Commissioner of Banks.

7. Defendant Western Sky Financial, LLC ("Western Sky") is a South Dakota limited liability company. Western Sky's offices are located on the Cheyenne River Indian Reservation. Martin Webb ("Webb") is the sole owner of Western Sky. Webb is a member of the Cheyenne River Sioux Tribe ("CRST"). Webb is not a CRST official or representative of the tribe's government.

8. The CRST does not have any ownership interest in Western Sky, nor is Western Sky operated by the CRST. Western Sky was not created by any tribal governing body or formed under tribal law, and the CRST does not receives any direct financial benefit from Western Sky. Instead, all profits made by Western Sky are distributed solely to Webb.[4]

---

[4] Compl. ¶¶ 30-31; Defendants do not contest these allegations in the Motion to Dismiss.

9.      Defendants CashCall, Inc. ("CashCall"), WS Funding, LLC ("WS Funding"), and Delbert Services Corporation ("Delbert") all have the same business address: 1600 South Douglass Road, Anaheim, California 92806. CashCall is a licensed mortgage lender in the State of North Carolina. Delbert is a licensed collection agency in the State of North Carolina. WS Funding does not hold any North Carolina licenses. There are no allegations, and Defendants do not contend, that Cash Call, WS Funding, or Delbert conducted any business on or had any other connection to the CRST Reservation.

10.      Defendant John Paul Reddam is a California resident. At all times relevant to this case, Reddam was the sole shareholder, President, and CEO of CashCall; the sole member, President, and manager of WS Funding; and the Director and owner of Delbert.

11.      Since at least 2010, Defendants have made and collected on consumer loans to North Carolina consumers.[5] Defendants promoted these loans through Western Sky's website and through television advertising in North Carolina.  Western Sky offered loans ranging in amounts from $850 to $10,000, and charged interest rates on the loans between 89.68% and 342.86%.   Borrowers were required to repay the loans in monthly installments with repayment periods ranging from 12 to 84 months.

12.      To obtain the loans, consumers were invited to submit an online application through Western Sky's website or to call Western Sky's toll free number. Western Sky then typically required the consumer to provide personal financial information relevant to the loan application, such as bank statements and pay stubs.[6]   After reviewing the consumer's application and financial information, Western Sky approved the loan, usually within a few hours, and communicated the approval by email or telephone.   Western Sky then

---

[5] Defendants contend that they stopped offering new loans to North Carolina consumers prior to initiation of this lawsuit.
[6] Compl. Exs. C-1, C-3, and C-4.

electronically provided the borrower a Consumer Loan Agreement ("Loan Agreement").[7] The borrower signed the Loan Agreement online and returned it electronically to Western Sky.[8] The borrower was required to check a box in the Loan Agreement acknowledging their agreement to the following: **"YOU HAVE READ ALL OF THE TERMS AND CONDITIONS OF THIS PROMISSORY NOTE AND DISCLOSURE STATEMENT AND AGREE TO BE BOUND THERETO. YOU UNDERSTAND AND AGREE THAT YOUR EXECUTION OF THIS NOTE SHALL HAVE THE SAME LEGAL FORCE AND EFFECT AS A PAPER CONTRACT."[9]** Upon approval, loans were electronically deposited into the consumer's bank account. Those same accounts were subsequently debited for monthly payments.

13. The Loan Agreement contained the following language on the first page:

> **This Loan Agreement is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation.** By executing this Loan Agreement, you, the borrower, hereby acknowledge and consent to be bound to the terms of this Loan Agreement, consent to the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court, and that no other state or federal law or regulation shall apply to this Loan Agreement, its enforcement or interpretation.[10]

14. In a separate section entitled "Governing Law," the Loan Agreement provided that:

> This Agreement is governed by the Indian Commerce Clause of the Constitution of the United States of America and the laws of the Cheyenne River Sioux Tribe. We do not have a presence in South Dakota or any other states of the United States. Neither this Agreement nor Lender is subject to the laws of any state of the United States of America. By executing this Agreement, you hereby expressly agree that this Agreement is executed and performed solely within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation. You also expressly agree that this Agreement shall be subject to and construed in accordance only with the provisions of the laws of the Cheyenne River Sioux Tribe, and that no

---

[7] Attachment A to Compl. Exs. C-1, C-2, C-3, and C-4.

[8] Defs.' Br. Supp. Mot. Dismiss 4. As will be described below in detail, Defendants argue that final approval of the loan did not occur until after the consumers submitted their signed loan agreements to Western Sky. Plaintiff disagrees.

[9] Attachment A to Compl. Exs. C-1, C-2, C-3, and C-4 (emphasis and capitalization in original).

[10] Emphasis in original.

United States state or federal law applies to this Agreement. You agree that by entering into this Agreement you are voluntarily availing yourself of the laws of the Cheyenne River Sioux Tribe, a sovereign Native American Tribal Nation, and that your execution of this Agreement is made as if you were physically present within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation.[11]

15.     Once a loan was finalized, Western Sky immediately sold and transferred the loan to WS Funding. Upon sale to WS Funding, the loan was serviced by CashCall. In some instances, the loan was later sold or transferred to Delbert for servicing and collections. Plaintiff alleges, incorporating findings of the New Hampshire Banking Commission in a separate proceeding against Defendants, that CashCall, and not Western Sky, is the primary party operating the lending business, and that Western Sky "is nothing more than a front to enable CashCall to evade licensure by state agencies and to exploit Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators."[12]

16.     Plaintiff alleges that the interest rates charged to consumers on the loans at issue are in violation of the North Carolina usury law.  North Carolina law provides that the maximum interest rate that can be charged to North Carolina consumers on a loan of $25,000 or less is 16% per annum. G.S. § 24-1.1.  Plaintiff also alleges that the interest rates charged by Defendants violate the North Carolina Consumer Finance Act, G.S. §§ 53-164 *et seq.*, and the UDTPA, G.S. §§ 75-1.1 *et seq.* Plaintiff contends that any loans in violation of the Consumer Finance Act are void under G.S. § 53-166(d). Plaintiff further argues that the Attorney General is entitled, pursuant to G.S. §§ 75-14 and 75-15.1, to obtain a refund of

---

[11] *Id.* at 3.

[12] Compl. ¶¶ 4, 17-21 (quoting *In re CashCall, Inc., John Paul Reddam, President and CEO of CashCall, Inc. and WS Funding, LLC*, N.H. Banking Commissioner No. 12-308 (June 4, 2013), *available at* http://www.nh.gov/banking/orders/enforcement/documents/12-308-cd-20130604.pdf).

money paid to Defendants plus civil penalties and injunctive relief to prevent further violations of the UDTPA.

17. The loans made by Defendants to North Carolina residents have resulted in North Carolina consumers being subjected to oppressive repayment requirements, harassing collection tactics, and reports of non-payment to credit agencies.[13] Multiple North Carolina consumers have complained to Plaintiff about Defendants.

18. Plaintiff alleges that "Defendants employ what is known as a rent-a-tribe scheme, in which unlicensed lender CashCall makes usurious consumer loans, . . . , by purporting to affiliate with an Indian tribe to claim federal tribal sovereign immunity."[14]

19. Since 2010, at least 14 states "have taken action against Defendants for unlawfully making loans without proper state licensure and in violation of state usury and consumer protection laws" resulting in numerous court and administrative orders requiring Defendants to cease and desist from making loans and imposing penalties and fines.[15]

20. Western Sky announced on its website that as of September 3, 2013, it was suspending business operations. There is no evidence in the record that Western Sky has advertised, solicited for, or made loans in North Carolina since that date.

## ANALYSIS

*Rule 12(b)(2) Motion to Dismiss Reddam for Lack of Personal Jurisdiction*

21. Defendants have moved to dismiss the Complaint as to Defendant John Paul Reddam pursuant to Rule 12(b)(2), for lack of personal jurisdiction. Defendants and Plaintiff have submitted affidavits with regard to the motion.

---

[13] Compl. ¶¶ 24-28.
[14] *Id.* ¶ 33.
[15] *Id.* ¶ 5, 36-42

22.     The standard for a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction depends on the procedural context confronting the court.  In a motion to dismiss for lack of personal jurisdiction, the facts alleged in the complaint are taken as true unless the defendants supplement their motion to dismiss with affidavits.  *Eluhu v. Rosenhaus*, 159 N.C. App. 355, 359 (2003) (citation omitted).  When affidavits or other evidence are offered, "the plaintiff must respond 'by affidavit or otherwise . . . [and] set[] forth specific facts showing that the court has jurisdiction.'"  *Id.* (quoting *Bruggeman v. Meditrust Acquisition Co.*, 138 N.C. App. 612, 615–16 (2000)). Where, as here, the parties have submitted "dueling affidavits" regarding the existence of personal jurisdiction, and the Court elects to review the Motion based on the affidavits in lieu of receiving oral testimony or depositions, "the trial judge must determine the weight and sufficiency of the evidence [presented in the affidavits] much as a juror." *Banc of Am. Sec. LLC v. Evergreen Int'l Aviation, Inc.*, 169 N.C. App. 690, 693-94 (2005) (quoting *Fungaroli v. Fungaroli*, 51 N.C. App. 363, 367 (1981)).  "The burden is on the plaintiff to prove by a preponderance of the evidence that grounds exist for the exercise of personal jurisdiction over a defendant." *Eluhu*, 159 N.C. App. at 359 (citation omitted).

23.     North Carolina courts

have adopted a two-part test to determine whether a court in this state may exercise personal jurisdiction over a nonresident defendant. The court first must determine whether our "long-arm" statute authorizes jurisdiction over the defendant. N.C. Gen. Stat. § 1-75.4 (2005). If the statute does authorize jurisdiction, the court next must "determine whether the court's exercise of jurisdiction over the defendant is consistent with due process." . . . Our primary determination thus is whether defendant [ ] had "'certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'" A defendant will be found to have sufficient minimum contacts with North Carolina when he has purposefully availed [himself] of the privilege of conducting activities within the forum state and invoked the benefits and protections of the laws of North Carolina. The relationship between the defendant and the forum state must be such that the defendant should "reasonably anticipate being haled into" a

North Carolina court. The facts of each case determine whether the defendant's activities in the forum state satisfy due process.

*Rauch v. Urgent Care Pharm., Inc.*, 178 N.C. App. 510, 517-18 (2006) (citations omitted).

24. Defendants do not dispute that the long-arm statute, G.S. § 1-75.4, would provide a basis for asserting jurisdiction over Reddam if the concerns of due process were satisfied. Instead, Defendants contend that Reddam does not have sufficient minimum contacts with North Carolina to provide a basis for this Court to exercise personal jurisdiction over him. It is undisputed that Reddam has never lived in or visited North Carolina, has no property or bank accounts in the State, and that he never interacted directly with any North Carolina residents in relation to the activities of CashCall, WS Funding, or Delbert.[16]

25. Plaintiff argues that the acts of CashCall, WS Funding, and Delbert should be attributed to Reddam for determining his minimum contacts with North Carolina, because those corporations were mere "instrumentalities" of Reddam. *See State ex rel. Cooper v. Ridgeway Brands Mfg.*, 362 N.C. 431, 438-40 (2008). Plaintiff alleges that Reddam "was the sole owner and shareholder, President, and Chief Executive Officer of CashCall; the President and sole member, manager, and owner of WS Funding; and the Director and owner of Delbert. . . . Mr. Reddam directed, controlled, and had managerial responsibility for the activities of CashCall, WS Funding, and Delbert, including the unlawful practices alleged herein."[17] Plaintiff contends that through Cash Call, WS Funding, and Delbert, Reddam "'purposefully directed'" his activities at residents of North Carolina, and "the [matter before the Court] resulted from alleged injuries that 'ar[ose] out of or relate[d] to' those activities.'" *Meyer v. Race City Classics, LLC*, __ N.C. App. __, __, 761 S.E.2d 196, 201 (2014) (quoting

---

[16] Aff. of J. Paul Reddam (Mar. 23, 2015).
[17] Compl. ¶ 11.

*Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985)); *see also Columbia Briargate Co. v. First Nat'l Bank*, 713 F.2d 1052 (4th Cir. 1983).

26. In North Carolina, "[t]he general rule is that in the ordinary course of business, a corporation is treated as distinct from its shareholders." *Ridgeway Brands Mfg., LLC*, 362 N.C. at 438. In proper circumstances, however, a court can look behind the corporate form and disregard the corporation's separate and independent existence. *Id*. at 438-39. Our appellate courts have repeatedly cautioned that disregarding the corporate form, or piercing the corporate veil, is a remedy that "should be invoked only in an extreme case where necessary to serve the ends of justice." *Dorton v. Dorton*, 77 N.C. App. 667, 672 (1985). "Piercing the corporate veil . . . allows a plaintiff to impose legal liability for a corporation's obligations, or for torts committed by the corporation, upon some other company or individual that controls and dominates a corporation." *Green v. Freeman*, 367 N.C. 136, 145 (2013). Courts will pierce the corporate veil to prevent the misuse of the corporate form for a fraudulent purpose or to avoid an unconscionable result. *See Ridgeway Brands Mfg., LLC*, 362 N.C. at 438-39.

27. In order to pierce the corporate veil, a party must show "that the corporation is so operated that it is a mere instrumentality or *alter ego* of the sole or dominant shareholder and a shield for his activities in violation of the declared public policy or statute of the State." *Green*, 367 N.C. at 145 (citation omitted). The "instrumentality rule" inquiry involves three elements:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of [a] plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Id.* at 145-46 (internal citations omitted). Factors relevant to the Court's analysis include "inadequate capitalization, noncompliance with corporate formalities, lack of a separate corporate identity, excessive fragmentation, siphoning of funds by the dominant shareholder, nonfunctioning officers and directors, and absence of corporate records." *Id.* at 145 (internal citations omitted).

28. The Court concludes that Plaintiff has failed to make a sufficient showing that CashCall, WS Funding, and Delbert were mere instrumentalities of Reddam such that the "corporate veil" should be pierced and their acts imputed to him. Plaintiff does not allege, and has not presented any evidence, that Reddam disregarded corporate formalities, was undercapitalized, failed to keep records, or many of the other indicia that a corporation is an "alter ego" of a shareholder. In fact, the exhibits to the affidavit that Plaintiff offered in support of exerting jurisdiction suggest that Reddam regularly maintained and updated business filings required by law, an indication that corporate formalities were at least followed to a degree.[18] Nor has Plaintiff alleged specific facts regarding how Reddam exercised day-to-day domination and control over CashCall, WS Funding and Delbert. While Plaintiff's allegations and evidence suggest that Reddam was significantly involved in directing the three companies, they do not establish that he so dominated and controlled them that they lost their separate corporate identities. Accordingly, Defendants' Motion to Dismiss Reddam pursuant to Rule 12(b)(2) for lack of personal jurisdiction should be GRANTED.

---

[18] Aff. of Sara K. Weed (Apr. 13, 2015) Exs. 2-8.

*Motion to Dismiss Defendants on the Basis of Tribal Sovereign Immunity*[19]

29.     Defendants next contend in their Motion to Dismiss that "this Court lacks subject matter jurisdiction because the State lacks legislative and adjudicative authority over the loans at issue here" and "North Carolina does not have the power to regulate the conduct at issue" because it "occurred within the [CRST] Reservation in South Dakota."[20] Defendants contend that the Court lacks jurisdiction because (1) Western Sky is a member of the CRST, (2) the Loan Agreements contain a choice-of-law provision making CRST law the governing law, and (3) the Loan Agreements were entered on tribal territory, because the agreements provided that they were entered within the CRST Reservation and the last act necessary to formation of the Loan Agreement occurred on the CRST Reservation. In other words, Defendants' argument is that North Carolina consumers voluntarily entered into the Loan Agreements with a member of the CRST on the CRST Reservation, such that exercising jurisdiction over this matter, and applying North Carolina's law to the claims, would infringe upon CRST's tribal sovereign immunity.

30.     Plaintiff argues that Defendants are not entitled to the protection of tribal sovereign immunity because Western Sky is not a tribal member, the State is not bound by the "choice-of-law" provision because it is not a party to the contracts, and the contracts were formed in North Carolina and are therefore within the reach of the applicable North Carolina statutes.  In addition, Plaintiff contends that North Carolina's significant State interest in

---

[19] In their briefing, Defendants never settle on a specific label for the theory that they advocate, but rather at various times discuss doctrines including tribal sovereignty, tribal immunity, and abstention. Def. Br. at, *e.g.*, 12, 14, and 16.  Nevertheless, the primary terminology Defendants use, and the primary thrust of their argument, seems to fall most squarely under the doctrine of tribal sovereign immunity and, accordingly, the Court will use this term when discussing Defendant's interrelated arguments.

[20] Defendants' Motion to Dismiss states that it is brought pursuant only to North Carolina Rule of Civil Procedure 12(b)(2) and 12(b)(6), but both the Motion and Defendants' brief in support expressly seek dismissal for lack of "subject matter jurisdiction." Defs.' Br. at 6.  Accordingly, the Court treats Defendants' motion as one challenging subject matter jurisdiction pursuant to Rule 12(b)(6).

protecting its citizens from usurious loan practices provides more than sufficient grounds for asserting jurisdiction over the claims raised by this action.

31.     The United States Supreme Court has held that the "sovereignty that Indian Tribes retain is of a unique and limited character." *Plains Commerce Bank v. Long Family Land and Cattle Co.*, 554 U.S. 316, 327 (2008) (quoting *United States v. Wheeler*, 435 U.S. 313, 323 (1978)). "It centers on the land held by the tribe and on tribal members within the reservation." *Id.* A tribal sovereign authority generally does not extend to non-members of the tribe who come within their borders. *Id.* at 328. The Supreme Court, however, identified two exceptions to this general rule: (1) "A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements;" and (2) "A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana v. United States*, 450 U.S. 544, 565-66 (1981). In other words, while tribal sovereignty is limited, it will be found to apply to "the powers of self-government . . . [that] involve *only the relations among members of a tribe*," so long as it is not the "exercise of tribal power beyond what is necessary to protect tribal self-government . . . ." *Id.* at 564-65 (emphasis in original).

32.     Defendants contend that Western Sky is a member of the CRST because Webb, Western Sky's sole owner, is a member of the tribe.[21] Defendants appear to argue that

---

[21] Defs.' Br. at 6-7 (citing *Cheyenne River Tele. Co. v. Pearman*, 89-006-A, at 3 (CRST Ct. App. 1990)).

because Western Sky is a tribal member, it is exempt from the authority of this Court.[22] Defendants further contend that CashCall, WS Funding, and Delbert are also protected as assignees of the loans and, accordingly, "stand in the shoes" of Western Sky.[23] Plaintiff contends that Western Sky is not member of the CRST merely by virtue of Webb's tribal membership, and notes a number of courts in other jurisdictions that have reached this conclusion.[24] Plaintiff also argues that Western Sky is not a tribal "arm of CRST."[25]

33. The Court, however, need not decide the question of whether Western Sky enjoys status as a tribal member, because even if Western Sky is a tribal member, that status does not automatically preclude this Court's jurisdiction. *Nevada v. Hicks*, 533 U.S. 353, 361-62 (2001) ("[T]he Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation. . . . When . . . state interests outside the reservation are implicated, states may regulate the activities even of tribe members on tribal land."); *Puyallup Tribe v. Dept. of Game*, 433 U.S. 165, 171 (1977) ("[R]egardless of tribal sovereign immunity, individual defendant-members of the Puyallup Tribe remain amenable to the process of the [state] courts in connection with . . . activities occurring off their reservation."). Far more dispositive is where the conduct at issue in the lawsuit took place, and the extent to which North Carolina's interests are implicated by that conduct. *Nevada*, 533 U.S. at 362; *Puyallup*, 433 U.S. at 171; *see also Pourier v. S.D. Dep't of Rev.*, 658 N.W.2d 395 (S.D. 2003), *aff'd in part and vacated in part on other grounds*, 674 N.W.2d 314 (2004) (finding that a business incorporated under South Dakota law, but owned by a

---

[22] *Id.* at 7-8 ("Western Sky enjoys the protections and privileges of tribal membership, including freedom from North Carolina's attempt to assert legislative and adjudicative jurisdiction over on-Reservation conduct.").

[23] *Id.* (citing *Wiener King Systems, Inc. v. Brooks*, 628 F. Supp. 843, 846 (W.D.N.C. 1986)). Defendants do not cite any authority for the proposition that tribal immunity can be assigned by a tribal member to a non-member.

[24] Pl.'s Br. at 4-5.

[25] *Id.* at 6-7.

tribal member and operating solely on the reservation, was exempt from a South Dakota motor fuel tax). *But see Wash v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134 (1980) (upholding a state tax for on-reservation cigarette sales to consumers who did not belong to the tribe).

34. In this case, it is the loan transactions between Defendants and the citizens of North Carolina that are at issue. Accordingly, in order to determine where the transactions took place, the Court must determine the location that the loan contracts at issue were formed. "The general principle . . . is that ordinarily the execution, interpretation and validity of a contract is to be determined by the law of the State or county in which it is made." *Bundy v. Comm. Credit Co.*, 200 N.C. 511, 516 (1931). As Defendants contend, the acceptance by one party of the other party's offer is usually the "last act" to formation of a contract, and courts have generally identified the location of this acceptance as the location of contract formation.[26] *Id.* at 515; *Liberty Fin. Co. v. N. Augusta Computer Store, Inc.*, 100 N.C. App. 279, 285 (1990).

35. Defendants argue that the loan contract was not formed until Western Sky reviewed the signed Loan Agreement returned by the North Carolina borrower and decided to offer funding. In other words, Defendants contend that the borrower's electronic return of the Loan Agreement, after they already had electronically signed and executed the agreement, constituted an offer that Western Sky accepted by "approving" the returned Loan Agreement. Because Western Sky's office is located on tribal grounds, Defendants argue, the contract was formed on the reservation. Defendants' position, however, does not comport with the allegations in the Complaint or the terms of the Loan Agreement.

---

[26] Defs.' Br. at 8.

36.     Here, consumers applied to Western Sky for a loan either by submitting an online application or by providing information over the telephone.  Western Sky then requested any additional financial information it needed from the consumer, reviewed it, and communicated its approval of the loan.  The Loan Agreement that Western Sky then sent to the borrower expressly required the borrower to agree that by signing the Agreement, the borrower agreed to be bound by its terms, and that the signed Agreement "shall have the same legal force and effect as a paper contract."   The Loan Agreement did not contain any language suggesting that the loan was contingent upon any further approval by Defendants. There also is nothing in the Complaint or in the record to support the contention that further approval or acceptance was required by Western Sky after the borrower signed the Loan Agreement. Based on this information, the Court concludes that the allegations support a finding that the last act necessary to formation of the Loan Agreements occurred in North Carolina. *Liberty Fin. Co.*, 100 N.C. App. at 285 ("[A] contract is made in the place where the last act necessary to make it binding occurred.").

37.     In addition, North Carolina's usury statute, which Plaintiff's claims seek to enforce, specifically provides that

> [f]or purposes of this Chapter, **any extension of credit shall be deemed to have been made in this State**, and therefore subject to the provisions of this Chapter if the lender offers or agrees in this State to lend to a borrower who is a resident of this State, **or if such borrower accepts or makes the offer in this State to borrow, regardless of the situs of the contract as specified therein**." G.S. § 24-2.1(a) (emphasis added).

The North Carolina Supreme Court has held that a contract "made in a foreign State or country with the intent and purpose to evade the usury laws of this State" is invalid and "the interest laws of North Carolina are applicable." *Bundy*, 200 N.C. at 517-18 (citations omitted). Plaintiff clearly alleges that Defendants are attempting to evade North Carolina's

consumer protection and usury laws.[27]   Accordingly, even if Defendants were able to prove

that the loan contracts were formed on the reservation, the Court finds nothing in the

pleadings or record to preclude North Carolina from exerting jurisdiction and applying North

Carolina law to the loans at issue.

38.     Defendants also argue that the "choice of law" provision and the provision

stipulating that that the contract was signed on tribal grounds and subject to tribal law

preclude jurisdiction by this Court. Plaintiff was not a party to the Loan Agreement, however,

and this Court is not persuaded that Plaintiff is bound by a choice of law provision in a

contract to which it is not a party. *See EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002)

(finding that the Equal Employment Opportunity Commission was not barred from bringing

an enforcement action where the employee in question had signed an arbitration agreement

with his former employer, in part because "[i]t goes without saying that a contract cannot

bind a nonparty"); *Pa. Dep't of Banking v. NCAS of Del., LLC*, 596 Pa. 638, 649, 948 A.2d

752, 759 (2008) (holding in an action to enjoin defendant from violating state's usury laws

that "the choice of law provision in [defendant's] contracts cannot bind the Department in

this action to enforce Pennsylvania public policy"); *BankWest, Inc. v. Oxendine*, 266 Ga. App.

771, 775, 598 S.E.2d 343, 347 (2004) ("The parties to a private contract who admittedly make

loans to Georgia residents cannot, by virtue of a choice of law provision, exempt themselves

from investigation for potential violations of Georgia's usury laws."); *Melia v. Zenhire, Inc.*,

462 Mass. 164, 172, 967 N.E.2d 580, 589 (2012) (noting the forum selection clause in a

contract entered into by a private party would not limit the attorney general from filing an

enforcement suit under the Massachusetts Wage Act in a Massachusetts court).   Accordingly,

the issue presented in this case is fundamentally different from the cases involving

---

[27] *See, e.g.*, Compl. ¶¶ 2, 4.

Defendants' loan practices recently decided by federal district courts in this State and cited by Defendants. *Brown v. W. Sky Fin., LLC*, No. 1:13 CV 255, 2015 U.S. Dist. LEXIS 11026 (M.D.N.C. Jan. 30, 2015); *Spuller v. Cash Call, Inc.*, No. 5:13-CV-806-D, 2014 U.S. Dist. LEXIS 181664 (E.D.N.C. Mar. 5, 2014); *Milam v. Cash Call, Inc.*, No. 5:13-CV-768-D (E.D.N.C. Mar. 4, 2014).[28] Each of those cases involved private plaintiffs who were parties to the loan agreements at issue, and who had agreed to the tribal forum and application of tribal law. The courts enforced the forum selection clauses against the plaintiffs. Those decisions are inapposite where, as here, Plaintiff was not a party to the Loan Agreements, but instead is acting as an enforcement arm of the State of North Carolina.

39.     Finally, the Court notes that North Carolina will not enforce a choice of law provision in a contract where the chosen law would "violate a fundamental policy of [North Carolina] of otherwise applicable law." *Behr v. Behr*, 46 N.C. App. 694, 696 (1980). The North Carolina usury statute makes clear that "[i]t is the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws." G.S. § 24-2.1(g). There can be no question that, through this action, Plaintiff is seeking to protect important State interests.

40.     Whether the issue presented by Defendants' Motion is properly characterized as one of tribal immunity, tribal sovereignty, or preemption (all terms used by Defendants before various tribunals and courts across the United States in raising these same arguments), the result remains the same. The Defendants are not protected, nor is North Carolina prevented from asserting jurisdiction over Defendants, by the fact that Western Sky is owned by a Native American. "[A]ny attempt to broadly construe the extraterritorial preemptive force of tribal jurisdiction to govern off-reservation conduct of nonmembers or the

---

[28] Defs.' Br. at 1.

states should be rejected – the *Montana* exceptions are narrow ones and cannot be construed in a manner that would swallow the rule." *In re Cash Call, Inc.*, DIA Nos. 12IDB002, 13IDB001, IDOB File No. 2012-NRR 2003-0154 (Iowa Div. of Banking, Apr. 23, 2014) (quoting *Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe of Miss. in Iowa*, 609 F.3d 927, 936 (8th Cir. 2010)). Defendants voluntarily chose to do business in North Carolina with its citizens without regard for this State's laws designed to protect North Carolina consumers. The State's interests here justify the exercise of jurisdiction over Defendants.

41.     Accordingly, for purposes of the Defendants' Motion to Dismiss, the Court concludes that the contracts were formed in North Carolina, that North Carolina law applies to this Court's analysis, and that Plaintiff is not bound by the choice of law provisions of the Loan Agreement. To the extent Defendants seek dismissal of Plaintiff's claims on the grounds of tribal sovereign immunity, that motion should be DENIED.

> *Motion to Dismiss Defendants on the Basis that North Carolina's Enforcement of Its Laws Against Defendants Violates the Dormant Commerce Clause*

42.     Defendants next argue that North Carolina's attempt to regulate the loans at issue violates the Dormant Commerce Clause of the United States Constitution. The Dormant Commerce Clause "prevents a State from jeopardizing the welfare of the Nation as a whole by placing burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear." *Am. Trucking Ass'ns v. Mich. PSC*, 545 U.S. 429, 433 (2005) (citations, quotations, and alterations omitted). In *American Trucking*, the Supreme Court upheld a fee charged by the State of Michigan to trucks engaging in intrastate commerce, finding that the statute did not "unjustifiably discriminate" against out-of-state entities or place a burden on interstate commerce that was "clearly excessive in relation to the putative local benefits." 545 N.C. at 433-44.

> The distinction between the power of the State to shelter its people from menaces to their health or safety and from fraud, even when those dangers emanate from interstate commerce, and its lack of power to retard, burden or constrict the flow of such commerce for their economic advantage, is one deeply rooted in both our history and our law.

*D.H. Holmes Co. v. McNamara*, 486 U.S. 24, 29-30 (1988) (quoting *H.P. Hood & Sons v. Du Mond*, 336 U.S. 525, 533 (1949)).

43. Defendants do not contend that the statutes Plaintiff seeks to enforce discriminate against out-of-state lenders in favor of North Carolina lenders, in violation of the commerce clause. *See e.g., Brown-Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 578-79 (1986). Rather, Defendants argue that North Carolina is somehow attempting to regulate Defendants' conduct outside of its borders by requiring Defendants to abide by North Carolina laws.[29] Accordingly, the Court must consider whether the regulations at issue here are excessive in relation to the putative local benefit. *Id.* ("When . . . a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). . . . [T]he critical consideration is the overall effect of the statute on both local and interstate activity.").

44. Defendants also do not argue that North Carolina lacks a legitimate interest in protecting its citizens from oppressive lending and harassing collection practices. The consumer protection, usury and unfair trade practices statutes have been implemented to protect North Carolina consumers, a purpose squarely within this State's ability to "shelter its people . . . from fraud." *See also Aldens, Inc. v. Packel*, 524 F.2d 38, 48-49 (3rd Cir. 1975) ("Congress has deferred to the states on the matter of maximum interest rates in consumer

---

[29] Defs.' Br. Supp. Mot. Dismiss 17-18.

credit transactions."); *State of Minn. v. CashCall, Inc.*, 2013 Minn. Dist. LEXIS 31, No. 27-CV-13-12740 (Minn. Dist. Ct. Sept. 6, 2013) ("[C]ourts throughout the United States have consistently allowed states to regulate the content of loan contracts made by out-of-state lenders to resident borrowers.").

45.     The statutes at issue do not attempt to regulate conduct beyond North Carolina's borders and do not unduly burden interstate commerce.  The statutes do not purport to dictate the interest rates or other lending practices that Defendants apply in any state other than North Carolina. *See Brown-Forman Distillers Corp.,* 476 U.S. 573 (finding that a New York law requiring out-of-state liquor producers to file monthly affirmation that prices offered to New York wholesalers were no higher than the lowest prices offered to wholesalers in other states was unconstitutional where it had the effect of forcing producers to stop offering certain promotional pricing to wholesalers outside of New York).  The Court concludes, based on this analysis, that the State's application of the relevant statutes to the loans at issue does not violate the Dormant Commerce Clause.

*Defendants' Rule 12(b)(6) Motion*

46.     Defendants also move to dismiss various claims and parties under Rule 12(b)(6).[30]  Specifically, Defendants argue the following:

   a.  The Complaint fails to state a claim against CashCall and Delbert for violation of the North Carolina usury statute (Count II) because CashCall and Delbert were not parties to the loan. G.S. § 24-1.1(a).  Instead, they were merely "loan servicers" who are not subject to liability under the Statute.

---

[30] Defendants also sought dismissal of claims against Reddam under Rule 12(b)(6).  Since the Court already has determined that it lacks personal jurisdiction over Reddam, it will address the 12(b)(6) motions only with regard to the appropriate remaining parties.

b.   The two year statute of limitations applicable to claims under the usury statute bars Plaintiff from pursuing claims for relief on loans on which consumers ceased making payments or defaulted before December 16, 2011.

c.   The Complaint fails to state a claim for violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") (i) as to all Defendants because it does not allege consumers relied upon the representation that the loans were made by an Indian tribe and subject to CRST law, and (ii) as to CashCall, Delbert and WS Funding because there cannot be successor or derivative liability under the UDTPA, and the Complaint does not allege that these parties had any connection to the alleged usurious loan.

The Court will address each argument in turn.

47.     A Rule 12(b)(6) motion should be granted when the complaint, on its face, reveals (a) that no law supports the plaintiff's claim, (b) the absence of facts sufficient to form a viable claim, or (c) some fact which necessarily defeats the plaintiff's claim. *Jackson v. Bumgardner*, 318 N.C. 172, 175 (1986). The facts and inferences set forth in the complaint should be treated in a light most favorable to the nonmoving party*. Ford v. Peaches Entm't Corp.*, 83 N.C. App. 155, 156 (1986). As our Court of Appeals has noted, the "essential question" raised by a Rule 12(b)(6) motion is "whether the complaint, when liberally construed, states a claim upon which relief can be granted on any theory." *Barnaby v. Boardman*, 70 N.C. App. 299, 302 (1984), *rev'd on other grounds*, 313 N.C. 565 (1985) (citations omitted).

48.     The Court will first address the Defendants' arguments regarding the claim for violation of the usury statute. The North Carolina usury statute establishes, among other things, limits on the interest that may be charged on various types of loans. "To establish that an agreement is usurious, it must be shown that (1) there was a loan, (2) there was an

understanding that the money lent would be returned, (3) for the loan a greater rate of interest than allowed by law was charged, and (4) there was corrupt intent to take more than the legal rate for the use of the money." *Bagri v. Desai*, 83 N.C. App. 150, 151 (1986). The penalty for a knowing violation of the usury statute is forfeiture of all interest paid. Further, the borrower or legal representatives of the borrower may recover twice the interest rate paid. G.S. § 24-2.

49.     Defendants argue that CashCall and Delbert cannot be liable for violation of the North Carolina usury statute because they are not parties to the contracts at issue. Defendants do not dispute that WS Funding, as a subsequent holder of the loans, would be liable if the contracts are found to be usurious.[31] Plaintiff argues that North Carolina courts look to the "substance" of an allegedly usurious transaction in deciding whether the loan violated usury law, and that Defendants here engaged in a "web of interrelated entities" through their common ownership.[32] Plaintiff contends that the Court should therefore find that CashCall and Delbert may be liable under a veil piercing theory.

50.     In support of their argument, Defendants cite to *In re Tetterton*, 379 B.R. 594, 600 (E.D.N.C. Bankr. 2007). In *Tetterton*, the "Notice of Assignment" sent by the defendant, a loan servicer, to the plaintiff, a borrower who had recently filed for Chapter 13 bankruptcy, specifically stated that the defendant was an assignee only as to the loan's servicing rights. The Bankruptcy Court for the Eastern District of North Carolina declined to hold the servicer liable under the plaintiff's claim that the loan that the servicer was pursuing was usurious. The court found that the plaintiff did "not submit any authority, nor [was] the court aware of any, that could support extending successor liability for usury claims to assignees of servicing

---

[31] Defs.' Br. Supp. Mot. Dismiss 19 (citing *Auto Fin. Co. v. N.C. v. Simmons*, 247 N.C. 724, 727 (1958)).
[32] Pl.s' Opp. Defs.' Mot. Dismiss 21.

rights who receive no beneficial interest in the loan." *Id.* The court compared the servicer's status to a typical principal-agent relationship, and concluded that the servicer was not independently liable for performing within the course and scope of its agency.

51.     Similarly, Defendants also cite to *Dillon v. BMO Harris Bank, N.A.*, 16 F. Supp. 3d 605 (M.D.N.C. 2014), in which the court dismissed a claim for aiding and abetting usury brought by a borrower against banks that served as originating depository financial institutions in the loans at issue. In making its ruling, the court explicitly noted that the plaintiff "[did] not contend that the defendants loaned him money at usurious rates," but rather "contend[ed] that the defendants aided and abetted the lenders in making and collecting usurious loans." *Id.* at 619. The court concluded that no cause of action existed under North Carolina law for aiding and abetting usury, and the claim was accordingly dismissed.

52.     Plaintiff urges the Court to adopt authority finding that the "courts of this state regard the substance of a transaction, rather than its outward appearance," when making a determination as to whether a loan violates usury law. *State ex rel. Cooper v. NCCS Loans, Inc.*, 174 N.C. App. 630, 634 (2005). The Court is not persuaded that this is sufficient to overcome the plain statutory language stating that the usury statute applies to "the parties to a loan." G.S. § 24-1.1. *See Applewood Props., LLC v. New South Props., LLC*, 366 N.C. 518, 522 (2013) (stating that, when statutory language is clear and unambiguous, courts should give effect to the plain meaning of the statute).

53.      Nonetheless, the Court finds the facts at bar to be distinguishable from both *Tetterton* and *Dillon*. Here, Plaintiff, bringing this lawsuit in its enforcement capacity, has alleged that "Defendants have regularly offered, made, collected, and are continuing to collect

on, illegal unsecured loans to North Carolina consumers."[33] The Complaint explicitly incorporates findings of fact made by the New Hampshire Banking Commissioner in its allegations, among them that CashCall "controls virtually all aspects of the lending process" and is the *de facto* lender for all Western Sky loans.[34] Unlike *Tetterton* and *Dillon*, the Complaint in this lawsuit explicitly alleges that Defendants have been involved with the loans at issue since their inception.

54.     Furthermore, as discussed above, the "instrumentality rule" allows courts to disregard corporate formalities between affiliated companies when the companies are shown to be so interrelated that one controls another, that control is complete and used to commit the fraud or wrong, and the control proximately caused the injury or loss complained of. *See, e.g.*, *Glenn v. Wagner*, 313 N.C. 450 (1985). The Court concludes that allegations in the Complaint indicate a relationship between Delbert, CashCall, and WS Funding, particularly in light of their shared ownership and business address, that could support a factual conclusion that WS Funding is an instrumentality of CashCall and Delbert. The Court therefore declines to adopt Defendants' argument that the usury claim should be dismissed as to CashCall and Delbert.

55.     Defendants also argue that Plaintiff is barred from asserting a claim on any loan last paid prior to December 16, 2011. The statute of limitations for claims for usurious loans is two years, though the relevant date for calculation of the statute of limitations depends on the type of relief that the plaintiff seeks. G.S. §§ 24-2, 1-53(2), (3). Plaintiff argues that its enforcement action is not limited by the fact that some of the loans were last paid prior to the two year statute of limitations, and that case law makes clear that "plaintiffs are required to show that within two years of filing their complaint *defendant charged <u>or</u>*

---

[33] Compl. ¶ 12.
[34] *Id.* ¶¶ 18-21.

*plaintiffs paid* a usurious fee." *Shepard v. Ocwen Fed. Bank, FSB*, 361 N.C. 137, 140 (2006) (emphasis added).

56. "It is well settled that the statute of limitations on the recovery of twice the amount of interest paid [as permitted by the usury statute] begins to run upon payment of the usurious interest." *Haanebrink v. Meyer*, 47 N.C. App. 646, 648 (1980). However, "[a] usurious rate of interest is charged [such that a creditor should be required to forfeit loan interest] when the debtor agrees or promises to pay it. Hence, the signing of a note calling for usurious interest is a charging within the meaning of the statute which would cause the period of limitation to begin." *Id.* at 650; *see also Adams v. Beard Dev. Co.*, 116 N.C. App. 105, 108 (1994) ("'[C]harging which constitutes a forfeiture under section 24-2 is the contract, promise, or agreement to a usurious rate of interest, as opposed to the actual collection or payment of that interest."). It follows that Plaintiff's claim should be DISMISSED insofar as it seeks forfeiture of interest for notes signed on or before December 16, 2011, and insofar as it seeks double recovery of unlawful interest paid prior to December 16, 2011. Except as granted herein, the Motion should be DENIED as to this claim.

57. Next, as to the claim for violation of the Unfair and Deceptive Trade Practices Act, Defendants argue that the claim should be dismissed insofar as it applies to CashCall, Delbert, and WS Funding, because there is no derivative or successor liability for violations of Chapter 75. Defendants further argue that Plaintiff cannot state a claim for violation of Chapter 75 based upon the contractual clauses identifying Western Sky as a tribal entity and seeking to apply CRST law without also alleging actual reliance on those misstatements. Conversely, Plaintiff argues that Defendants CashCall, Delbert, and WS Funding were not unsuspecting successors, but were involved from the start, and that it is not required to show actual injury when bringing a claim for violations of Chapter 75 in its enforcement capacity.

58. The Court has already found that the Complaint brings allegations against "Defendants" for making and collecting on the usurious loans. As discussed above, the allegations that Defendants orchestrated a network of loans, that CashCall was the *de facto* lender, and the apparent interrelatedness of the companies, allow the Court to conclude at this juncture that the UDTPA allegations as to all Defendants are sufficient to survive a 12(b)(6) motion to dismiss.

59. Finally, it has previously been said by the courts of North Carolina that "violations of statutes designed to protect the consuming public and violations of established public policy may constitute unfair and deceptive practices." *NCCS Loans, Inc.*, 174 N.C. App. at 641 (quoting *Stanley v. Moore*, 339 N.C. 717, 723 (1995)) (finding that language in G.S. § 24-2.1 identifying protection of North Carolina borrowers from usurious loans as "paramount public policy," combined with "clear violation" of that public policy, was sufficient to support a violation of Chapter 75). Because a court should view a Rule 12(b)(6) motion to dismiss in the light most favorable to the nonmovant, the Court relies on its conclusion above that Plaintiff has stated a viable claim for violation of North Carolina's usury statute to find that Plaintiff may have alleged a violation of the North Carolina UDTPA, and that Plaintiff need not have alleged actual reliance to bring this claim. Accordingly, the Motion to Dismiss is DENIED as to the claim for violation of the North Carolina UDTPA.

### *Plaintiff's Motion for Preliminary Injunction*

60. Having addressed the Motion to Dismiss, the Court now turns to Plaintiff's Motion for Preliminary Injunction. Plaintiff's Motion seeks the following relief from the Court:

> a. "[A] preliminary injunction [issued] pursuant to N.C. Gen. Stat. § 75-14 prohibiting Defendants, their agents, employees, and corporate successors or assigns, and any persons acting in concert with them, from: a) Advertising,

offering, and/or entering into contracts to offer, fund, service, and/or collect on consumer loans made to North Carolina borrowers; b) Soliciting and/or accepting deposits or payments from North Carolina consumers for any loan product or service; c) Collecting upon any further payment, directly or indirectly, from North Carolina consumers related to any loan product or service; d) Selling or transferring any loans with North Carolina consumers currently held by any Defendant to a third party; e) Destroying, transferring, concealing, altering, or removing from their possession or control any financial records, consumer contracts, emails, correspondence, business records, and/or other documents of Defendants relating to loans made to North Carolina consumers; and/or f) Transferring, withdrawing, concealing, or encumbering any assets outside of the normal course of business of Defendants pending further order of the Court;"[35]

b.      An order requiring Defendants to produce to the Court and Plaintiff certain written financial information within ten days of the Court's order; and

c.      An order requiring Defendants to establish an escrow account "to provide full restitution to all affected consumers," in which Defendants would be "required to maintain a balance in that account equal to the amount of funds collected to date which exceed payment of the principal plus 16% of the interest for the loans issued to North Carolina consumers by Defendants within the past six (6) years."

61.    G.S. § 75-14 provides that "the Attorney General may prosecute civil actions in the name of the State . . . to obtain a mandatory order, including (but not limited to)

---

[35] Mot. Prelim. Inj. 3-4.

permanent or temporary injunctions . . . , to carry out the provisions of this Chapter." The Attorney General may enforce North Carolina's usury statute and Consumer Finance Act through an order obtained under G.S. 75-14. *See NCCS Loans, Inc.*, 174 N.C. App. at 640-42.

62.     A preliminary injunction is an extraordinary measure that "will not be lightly granted." *Travenol Labs., Inc. v. Turner*, 30 N.C. App. 686, 692 (1976) (citation omitted). To obtain such relief, a plaintiff must generally show "a likelihood of success on the merits of his case and . . . [that] plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of his rights during the course of litigation." *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 466 (2003) (citations omitted). When the Attorney General brings an enforcement action "to vindicate public interest rather than to redress individual grievances," however, a more lenient standard may apply to the requirement of irreparable loss or harm, and the State need not show "actual injury" to obtain an injunction; rather, the State-movant must show that the "act or practice complained of adversely affects the public interest." *State ex rel. Edmisten v. Challenge, Inc.*, 54 N.C. App. 513, 521-22 (1981). In *Challenge, Inc.*, the court explicitly took note of the fact that G.S. § 75-14 provides the Attorney General with the authority to obtain mandatory orders to enforce the North Carolina Unfair and Deceptive Trade Practices Act. *Id.*; *see also State ex rel. Ross v. Overcash*, 2008 N.C. App. LEXIS 1669 (Sept. 16, 2008) (affirming an injunction issued in an enforcement action that required the defendant to close a mining operation pending compliance with statutory law, even in the absence of actual or apparent injury).

63.     The movant bears the burden of establishing the right to a preliminary injunction. *Pruitt v. Williams*, 288 N.C. 368, 372 (1975). The issuance of an injunction is "a

matter of discretion to be exercised by the hearing judge after a careful balancing of the equities." *State ex rel. Edmisten v. Fayetteville St. Christian Sch.*, 299 N.C. 351, 357 (1980).

64. The relief sought by Plaintiff is in the nature of both a prohibitory injunction (enjoining certain activities by Defendants in North Carolina) and a mandatory injunction (requiring the production of financial records and the creation of an escrow account.) While mandatory injunctions generally are disfavored, under proper circumstances such relief may be necessary and appropriate. *See Roberts v. Madison Cnty. Realtors Ass'n.*, 344 N.C. 394, 400 (1996). An injunction that is mandatory in nature, rather than prohibitory, "will ordinarily be granted only where the injury is immediate, pressing, irreparable, and clearly established." *Auto. Dealer Res., Inc. v. Occidental Life Ins. Co.*, 15 N.C. App. 634, 639 (1972).

65. Having already disposed of Defendants' arguments regarding Rule 12(b)(6) and the applicability of North Carolina law to the claims at bar, the overwhelming evidence before the Court indicates that consumers signed loans initiated and serviced by Defendants that charge interest rates far above those permitted under North Carolina law. The State has further produced evidence that Defendants' loans create significant, unsustainable financial burdens for vulnerable North Carolina consumers. *See Overcash*, 2008 N.C. App. LEXIS 1669 at *11 (holding that "findings as to the ongoing and continuous statutory violations . . . support the conclusion that [the defendant's] mining operation without a permit was injurious to the public interest").

66. The allegations and evidence before the Court at this stage of the case support the conclusion that Plaintiff has established a likelihood of success on the merits of its claims against Defendants. In particular, there is no dispute that Defendants are charging North Carolina consumers interest rates in excess of the rate permitted by North Carolina's usury statute, and that these activities provide a basis to conclude that Plaintiff is also likely to succeed on its claims under the North Carolina Consumer Finance Act and the North

Carolina Unfair and Deceptive Trade Practices Act. Accordingly, the Court must consider whether Plaintiff has shown that the "act or practice complained of adversely affects the public interest," under the standard articulated in *Challenge, Inc.*, or whether the State is likely to suffer irreparable harm if Defendants are not enjoined, under the more common standard for obtaining injunctive relief.

67. Again, it is undisputed that North Carolina consumers have been paying interest on loans in an excessive rate, and must continue to do so unless Defendants are enjoined from making or collecting on those loans. As discussed *supra*, the North Carolina usury statute states that it is in the public interest "to protect North Carolina resident borrowers through the application of North Carolina interest laws." G.S. § 24-2.1(g). It follows that violation of North Carolina's interest laws "adversely affects the public interest," and that Plaintiff has demonstrated a right to injunctive relief under *Challenge, Inc.*

68. In *State ex rel. Morgan v. Dare to Be Great, Inc.*, 15 N.C. App. 275 (1972), the North Carolina Court of Appeals upheld an injunction granted against a company operating an illegal pyramid scheme on the basis that the State "through economic loss to its individual citizens and residents [] may suffer immediate and irreparable injury unless the defendants are enjoined during the pendency of this action." *Id.* at 276. The court noted that such an injunction was appropriate under the Attorney General's Chapter 75 enforcement authority, even though individual consumers could also be entitled to their own remedies. Accordingly, the Court finds that Plaintiff has also established a risk of irreparable harm typically required for obtaining injunctive relief.

69. The Court therefore proceeds to analyze the relief sought by the Plaintiff.

70. Plaintiff's requests for an order requiring Defendants to create an escrow account and to produce certain financial records are arguably intertwined. In its Reply Brief, Plaintiff states that the financial records that it seeks would be "for the benefit of the Court

in making the determination of the appropriate amount to place in an escrow fund."[36] The Court will therefore address these requests for relief together.

71.     Defendants argue that Plaintiff's request for the establishment of an escrow account amounts to a request for payment before judgment. *See Grupo Mexicano de Desarrollo v. Alliance Bond Fund*, 527 U.S. 308, 329 (1999) ("[F]ederal courts in this country have traditionally applied the principle that courts of equity will not, as a general matter, interfere with the debtor's disposition of his property at the instance of a nonjudgment creditor."). Defendants further note that the escrow account would be implemented to facilitate payment of monetary damages, which are as a matter of law not irreparable. Plaintiff contends that an escrow account is necessary "[t]o ensure adequate funds are available for restitution to North Carolina consumers,"[37] identifying as cause for concern moneys paid or that may potentially be paid by Defendants pursuant to pending actions against Defendants in other jurisdictions.

72.     The Court finds instructive several opinions issued by the Supreme Court of the United States regarding injunctive relief in the context of a debtor-creditor relationship, where the relief sought is frequently monetary. In *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940), the petitioners sued a company that had sold them stock certificates, contending that the transaction was fraudulent, and alleging that the company was insolvent and was likely to make preferential payments to other creditors. The Supreme Court found that an injunction restraining the company from transferring or disposing of any assets was appropriate in light of the equitable nature of the claim for restitution asserted by the petitioners. Similarly, in *United States v. First National City Bank*, 379 U.S. 378 (1965), the Court upheld an injunction enjoining the respondent from transferring any property or rights

---

[36] Reply Supp. Mot. Prelim. Inj. 8.
[37] Pl.'s Br. Supp. Mot. Prelim. Inj. 26.

to property, when the injunction was issued based on a tax lien and a statute giving courts the authority to issue injunctions to uphold internal revenue laws. The Court took specific note of the "public interest involved," noting that courts "may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Id.* at 383 (quoting *Virginian R. Co. v. Federation*, 300 U.S. 515, 522 (1937)).

73. Conversely, in *De Beers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212 (1945), the United States sought to enjoin several corporations from removing their assets from the country pending resolution of antitrust claims. In support of the injunction, the government argued that the corporations could "quickly withdraw their assets from the United States and so prevent enforcement of any order or decree which this Court may render." *Id.* at 215. The Court found that the relief sought was inappropriate, because the injunction would restrain "a matter lying wholly outside the issues in the suit." *Id.* at 220.

74. Finally, Defendants analogize the case at bar to *Grupo Mexicano de Desarrollo*, 527 U.S. 308, in which the Supreme Court of the United States reviewed the propriety of an injunctive order precluding the petitioner, a Mexican holding company, from transferring its right to receive certain notes from the Mexican government. The respondents, investment funds who had purchased loan notes guaranteed by the petitioner's subsidiaries, brought suit alleging breach of contract for the petitioner's failure to make payments on the loan notes. The respondents had obtained injunctive relief by alleging that the petitioner was or was about to be insolvent, which would "frustrate any judgment" that the respondents might obtain. *Id.* at 312.

75. The Supreme Court looked to precedent from courts of equity, and found that creditors would traditionally only have a right to restrain a debtor's property after obtaining a judgment, thereby obtaining a "cognizable interest" in the property of the debtor. *Id.* at 319-

20. The Court distinguished the facts of *Grupo Mexicano* from previous Supreme Court cases allowing injunctive relief over a party's assets, noting that a judgment is typically required to establish a right to control a debtor's property, and ultimately concluded that it had "no authority to craft a 'nuclear weapon' of the law like the one advocated here." *Id.* at 332.

76.     A review of this precedent indicates that a court may well have the authority to issue the type of mandatory injunctive relief Plaintiff seeks where the relief sought is based in equity and the petitioner has alleged a "cognizable interest" in the particular property or assets that would be affected by the injunction. *See, e.g.*, *United States v. Oncology Assocs.*, 198 F.3d 489, 496 (4th Cir.1999) ("[W]hen the plaintiff creditor asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the *status quo* pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested.").

77.     Applying this analysis to the facts before the Court, it is true that at least some portion of the relief that Plaintiff seeks in its Complaint is equitable in nature.[38] Nevertheless, the Court is skeptical that the State may assert an equitable interest in Defendants' assets prior to the entry of judgment, where it is seeking monetary remedies on behalf of private citizens. Unlike *First National City Bank*, 379 U.S. 378, the "public interest" involved here is not tax money owed to the government. Similarly, in *Oncology Associates.*, 198 F.3d 489, the federal government sought reimbursement and other remedies for payments fraudulently obtained by the defendants from Medicare and other federal programs. 198 F.3d at 492. The Court is not convinced that in this action the State may

---

[38] Compl. ¶¶ 58, 64.

stand in the position of "creditor" for purposes of asserting an equitable interest in Defendants' property and assets.

78. The Court need not decide this question, however, as it does not believe that Plaintiff has presented sufficient evidence to justify the imposition of this mandatory injunctive relief on Defendants. Plaintiff has not alleged, much less produced any evidence, that Defendants are seeking to reallocate assets to shield those assets in the event of a judgment, that Defendants' assets are diminishing, or that Defendants' liabilities exceed their assets. Instead, Plaintiff urges the Court to conclude that an escrow account is appropriate equitable relief based upon solely upon the potential financial impact of other pending actions and settlements involving Western Sky in other jurisdictions. Rather, Plaintiff has conceded that, roughly a year and a half after this case was filed and four months after entry of the Case Management Order, it had not served any written discovery requests to Defendants that would permit it to determine the need for such a drastic remedy. Plaintiff has not provided the Court with any basis to conclude that the escrow account, which would impose a significant restraint on Defendants' assets, is necessary or appropriate. *See Roberts*, 344 N.C. at 401 ("A court of equity traditionally has discretion to shape the relief in accord with its view of the equities or hardships of the case.").

79. Ultimately, Plaintiff has not demonstrated that it is entitled to the mandatory relief sought, even with the more generous standard established in *Challenge, Inc.* The Court concludes, in the exercise of its discretion, that Plaintiff's request for an injunction mandating the establishment of an escrow account and requiring Defendants to produce certain financial information should be DENIED.

80. The Court now moves to the remaining injunctive relief sought. Generally, Plaintiff seeks an order prohibiting Defendants from advertising, soliciting for and entering into any new loan agreements in North Carolina; destroying, concealing or altering financial

records and other documents relevant to the claims in this lawsuit; selling or transferring to any third party existing loans it has with North Carolina consumers; and "transferring, withdrawing, concealing, or encumbering any assets outside of the normal course of business." Plaintiff also seeks to prohibit Defendants from continuing to collect on existing loans to North Carolina consumers.

81. The Court concludes that Plaintiff's request that Defendants be enjoined from "transferring, withdrawing, concealing, or encumbering any assets outside of the normal course of business" is akin to the request for mandatory relief upon which the Court has already ruled. Accordingly, the Court concludes that this portion of the Motion should also be DENIED.

82. The Court, however, reaches a different result with regard to Plaintiff's requests for other prohibitory injunctive relief. As discussed above, the Court is persuaded that Plaintiff has demonstrated a likelihood of success on the merits of its Claims, the threat of irreparable injury if Defendants are not enjoined from continuing to make loans, and that continued loan activity in North Carolina would be adverse to the public interest. Furthermore, Defendants themselves have stated that Western Sky ceased making loans in North Carolina "months before the Complaint was filed,"[39] indicating that a restriction on Defendants' ability to initiate new loans would not be a significant hardship.

83. In light of the foregoing, the Court concludes that it is appropriate to enjoin Defendants from engaging in activity that would result in the creation of new loans or the collection of payments on those that already exist, in addition to restraining Defendants' ability to destroy evidence that may be relevant to Plaintiff's claims.

---

[39] Defs.' Opp. Mot. Prelim. Inj. 1.

84. Plaintiff's request for a prohibitory injunction enjoining Defendants from making or collecting on further loans in the State of North Carolina is GRANTED.

THEREFORE, IT IS ORDERED that:

85. Defendants' Motion to Dismiss is GRANTED, in part, as follows:

a. All claims against Defendant John Paul Reddam are DISMISSED, for lack of personal jurisdiction.

b. Plaintiff's claim for violation of the North Carolina usury statute, to the extent that the claim seeks forfeiture of interest for notes signed on or before December 16, 2011, and insofar as it seeks double recovery of unlawful interest paid prior to December 16, 2011, is DISMISSED.

86. Except as granted herein, Defendants' Motion to Dismiss is DENIED.

87. Plaintiff's Motion for Preliminary Injunction is GRANTED, in part, as follows:

a. Defendants Western Sky Financial, LLC, CashCall, Inc., WS Funding, LLC, and Delbert Services Corporation (collectively "the Enjoined Parties"), their agents, employees, and corporate successors or assigns, and any persons acting in concert with them, are hereby ENJOINED from:

i. Advertising, offering, and/or entering into contracts to offer, fund, service, and/or collect on consumer loans made to North Carolina borrowers;

ii. Soliciting and/or accepting deposits or payments from North Carolina consumers for any loan product or service;

iii. Collecting upon any further payment, directly or indirectly, from North Carolina consumers related to any loan product or service;

iv. Selling or transferring any loans with North Carolina consumers currently held by any the Enjoined Parties to a third party;

v. Destroying, transferring, concealing, altering, or removing from their possession or control any financial records, consumer contracts, emails, correspondence, business records, and/or other documents of the Enjoined Parties relating to loans made to North Carolina consumers; and/or

88. Except as granted herein, the Motion for Preliminary Injunction is DENIED.

This the 27th day of August, 2015.


/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
 for Complex Business Cases