STATE OF NORTH CAROLINA ex rel. ROY COOPER, Attorney General, and JOSEPH A. SMITH, Jr., Commissioner of Banks, Plaintiff v. NCCS LOANS, INC.; JAGJRTX, LLC; JAG NC, LLC d/b/a "Advance Internet" and "Advance Til Payday;" and JOHN A. GILL, Defendants

No. COA04-1660

(Filed 6 December 2005)

## 1. Interest— loans—usury—Consumer Finance Act

The trial court did not err by entering summary judgment for plaintiffs on the issues of whether defendants violated the Consumer Finance Act and made usurious loans when Advance Internet customers were required to repay both a cash advance that was purportedly a "rebate" on an internet services contract and an additional fee of at least 20% of the amount of cash received where the internet access that was the ostensible subject of the contract had little or no monetary value, because: (1) the undisputed evidence of defendants' advertising and business practices supported the trial court's finding that defendants' sale of internet service is merely a guise for its operation as a small loan business; (2) defendants charge 100 times more per hour than legitimate internet service providers for very limited internet access a few hours a week available only on defendants' office computers and only by appointment during defendants' business hours, and North Carolina public libraries offer free access to the internet; (3) the substance of the product is the cash rebate, and the cash rebates are not related or associated with any payment for something of real value; (4) the fair market value of Advance Internet contracts is negligible or zero, and the evidence suggested no rational reason to contract with defendant except to get immediate cash; (5) the dollar amount of the periodic payments, when calculated as interest, revealed that the annual rate of interest on these loans was greatly in excess of the maximum permitted under North Carolina law; (6) the uncontradicted material facts provided no basis for a reasonable factfinder to conclude the Advance Internet contracts were anything other than short-term loans; (7) plaintiff is not required to show that in each and every transaction defendants and the customer had the specific corrupt intent to enter into a usurious loan agreement; and (8) the fact that some customers may have used defendants' computers to access the internet does not change the reality that such use was incident to the central purpose of obtaining a cash loan.

IN THE COURT OF APPEALS                    631

STATE ex rel. COOPER v. NCCS LOANS, INC.

[174 N.C. App. 630 (2005)]

2. **Unfair Trade Practices— violation of North Carolina's Consumer Finance Act—usurious loans**

The trial court did not err by entering summary judgment for plaintiffs on the issue of whether defendants engaged in unfair or deceptive trade practices when Advance Internet customers were required to repay both a cash advance that was purportedly a "rebate" on an internet services contract and an additional fee of at least 20% of the amount of cash received while the internet access that was the ostensible subject of the contract had little or no monetary value, because: (1) proof of actual deception is not necessary, but instead it is enough that the statements had the capacity to deceive; (2) defendants did not inform consumers that they were executing documents in violation of North Carolina's Consumer Finance Act, and based on all the facts defendants' contracts had the capacity to deceive; and (3) it is a paramount public policy of North Carolina to protect its resident borrowers through the application of North Carolina interest laws, and defendants' practice of offering usurious loans was a clear violation of this policy.

3. **Contracts— loans—charging higher interest rate— cancellation**

The trial court did not err by decreeing that Advance Internet rebate contracts with North Carolina consumers were cancelled pursuant to N.C.G.S. § 75-15.11 and by requiring all funds collected by defendants pursuant to such contracts be refunded to consumers, because: (1) the trial court's order is authorized by N.C.G.S. § 53-166(d) and N.C.G.S. § 24-2; (2) having already concluded that the trial court did not err by granting summary judgment for plaintiffs, this issue has necessarily been resolved against defendants; and (3) although defendants contend the court was required to apportion defendants' refund of funds collected by defendants pursuant to the contracts, defendants failed to offer any argument or authority to support this position as required by N.C. R. App. P. 28(b)(6).

4. **Pleadings— motion to amend—additional party**

The trial court did not abuse its discretion by allowing plaintiff's motion to amend the complaint to add John Gill as a defendant and by entering summary judgment against him individually, because: (1) defendants failed to appeal the order allowing Gill's addition as a defendant; (2) defendants cite no authority for the proposition that N.C.G.S. § 1-278 requires the Court of Appeals to

review an interlocutory order; (3) regardless of whether N.C.G.S. § 57C-3-30(b) restricts the circumstances in which a member of a limited liability company may be added as a party to a lawsuit, N.C.G.S. § 57C-3-30(a) anticipates that a member who is also a manager, director, executive, or any combination thereof might be made a defendant and become personally liable by reason of his own acts or conduct; and (4) defendant had the right to offer evidence opposing summary judgment, notwithstanding his failure to file an answer, but defendant offered no evidence contradicting plaintiff's assertion that he directed and controlled the illegal activities of corporate defendants.

Appeal by defendants from judgment entered 9 September 2004 by Judge W. Osmond Smith, III in Wake County Superior Court. Heard in the Court of Appeals 13 September 2005.

*Attorney General Roy Cooper, by Special Deputy Attorney General L. McNeil Chestnut, Assistant Attorney General Philip A. Lehman, and Assistant Attorney General M. Lynne Weaver, for the State.*

*Ellis and Winters LLP, by Matthew W. Sawchak, Thomas D. Blue, Jr., and George F. Sanderson, III, for defendants-appellants.*

LEVINSON, Judge.

Defendants (NCCS Loans, Inc.; JAGJRTX, LLC; JAG N.C., LLC, d/b/a "Advance Internet" and "Advance Til Payday"; and John Gill), appeal from summary judgment entered in favor of plaintiff (State of North Carolina). We affirm.

[1] "The question before us, which appears to be one of first impression, requires us to determine whether a company's policy of extending to its customers an immediate cash 'rebate,' as well as [use of its office computers for a few hours a week, by appointment, to access the internet], in exchange for a one-year commitment to make bi-weekly payments in an amount equal to five times the amount of the rebate, is tantamount to the operation of a small loan business in violation of [North Carolina's] usury laws." *Short on Cash.net v. Dep't of Finan.*, 811 N.E.2d 819, 824 (Ind. Ct. App. 2004). The Defendant NCCS Loans is a corporation which until 31 August 2001 did business in North Carolina through its "Advance Til Payday" check-cashing stores, where it offered deferred deposit loans. On

STATE ex rel. COOPER v. NCCS LOANS, INC.

[174 N.C. App. 630 (2005)]

1 September 2001 defendant closed Advance Til Payday, and re-opened its stores under the name "Advance Internet." Corporate defendant JAGJRTX, LLC succeeded NCCS as owner of Advance Internet. On 12 February 2002 plaintiff filed suit against defend-ants NCCS Loans, Inc., and JAGJRTX, LLC, d/b/a "Advance Internet" and "Advance Til Payday." Plaintiff sought injunctive and other relief for (1) usury, in violation of N.C. Gen. Stat. § Chapter 24; (2) violation of the North Carolina Consumer Finance Act, N.C. Gen. Stat. § 53-166; and (3) unfair and deceptive trade practices, in violation of N.C. Gen. Stat. § 75-1.1. In March 2003 plaintiff moved to amend its complaint to add two additional defendants, JAG N.C., LLC d/b/a "Advance Internet" and "Advance Til Payday"; and John Gill. Defendants con-sented to the addition of JAG N.C., LLC. Gill was added by court or-der entered in June 2003. Plaintiff also filed a motion for summary judgment, which was heard by the trial court in June 2004. On 9 September 2004 the court entered an order granting summary judg-ment in favor of plaintiff on all claims. Defendants have appealed the summary judgment order. "Summary judgment is an appropriate dis-position only 'if the pleadings, depositions, answers to interrogato-ries, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.' " *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 578-79, 573 S.E.2d 118, 123 (2002) (quoting N.C. Gen. Stat. § 1A-1, Rule 56(c) (2001)). Defendants herein argue that the trial court erred by granting summary judgment for plaintiff, on the grounds that the evidence raised genuine issues of material fact as to whether they violated the Consumer Finance Act, made usurious loans, or engaged in unfair or deceptive trade prac-tices. We disagree.

"Interest is the premium allowed by law for the use of money, while usury is the taking of more for its use than the law allows. It is an illegal profit." *Yarborough v. Hughes*, 139 N.C. 199, 207, 51 S.E. 904, 907 (1905). "The elements of usury are [1] a loan or forbearance of the collection of money, [2] an understanding that the money owed will be paid, [3] payment or an agreement to pay interest at a rate greater than allowed by law, and [4] the lender's corrupt intent to receive more in interest than the legal rate permits for use of the money loaned." *Swindell v. National Mortgage Ass'n*, 330 N.C. 153, 159, 409 S.E.2d 892, 895-96 (1991) (citations omitted). "Usury statutes are designed to protect the borrower whose necessity and importu-nity may place him at a disadvantage with respect to the exactions of the lender[.]" *Mortgage Co. v. Zion Church*, 219 N.C. 395, 397, 14

S.E.2d 37, 38 (1941) (quoting *Hill v. Lindsay*, 210 N.C. 694, 699, 188 S.E. 406, 409 (1936)).

Regulation of consumer loans is addressed in Chapter 24 of the General Statutes, N.C. Gen. Stat. § 24-1.1, and the North Carolina Consumer Finance Act, N.C. Gen. Stat. § 53-164, *et seq.* (2003). The maximum allowable rate of interest on consumer loans of $25,000 or less is set forth in N.C. Gen. Stat. § 24-1.1(c). Under the Consumer Finance Act, a consumer lender may not charge interest "greater than permitted by Chapter 24" on loans of $10,000 or less without first obtaining a license from the North Carolina Commissioner of Banks. N.C. Gen. Stat. §§ 53-166 and 53-168 (2003). In sum, for an unlicensed lender to charge a rate of interest on a small loan greater than the rates permitted is a violation both of the Consumer Finance Act, and of Chapter 24's prohibitions on usury. In the instant case, it is undisputed that defendants are not licensed by the Commissioner of Banks.

However, usury laws apply only to loans, not to sales. *Auto Supply v. Vick*, 303 N.C. 30, 47-48, 277 S.E.2d 360, 372 (1981) ("If there is a bona fide purchase of property as opposed to a subterfuge to conceal a loan at a usurious rate, then the usury laws have no application whatsoever, even though the sale is made at an exorbitant price."). A loan is "made upon 'the delivery by one party and the receipt by the other party of a given sum of money, an agreement, express or implied, to repay the sum lent, with or without interest.' " *Kessing v. Mortgage Corp.*, 278 N.C. 523, 529, 180 S.E.2d 823, 827 (1971) (quoting 54 C.J.S. LOANS, p. 654) (other citations omitted). Significantly, N.C. Gen. Stat. § 53-166(b) (2003) expressly states that its provisions "apply to any person who seeks to avoid its application by any device, subterfuge or pretense whatsoever." Thus:

> The courts of this state regard the substance of a transaction, rather than its outward appearance, as controlling. Specifically, when there is an allegation that the usury laws have been violated by a particular act or course of conduct, the courts of North Carolina will not hesitate to look beneath the formality of the activity to determine whether such an incident is, in fact, usurious.

*Auto Supply*, 303 N.C. at 37, 277 S.E.2d at 366 (citing *Ripple v. Mortgage Corp.*, 193 N.C. 422, 137 S.E. 156 (1927)) (other citations omitted).

**STATE EX REL. COOPER v. NCCS LOANS, INC.**

[174 N.C. App. 630 (2005)]

Defendants previously offered deferred deposit loans, commonly known as "payday loans", through their "Advance Til Payday" check-cashing stores in North Carolina. To obtain such a loan, the customer would write a check payable to the payday lender after providing proof of employment and a checking account. The lender then gave the customer 85% of the face value of the check in cash, and agreed not to present the check to the bank for two weeks, or until the customer's next paycheck. In return for the delay in presenting the check, the lender would retain 15% of the check's face value. If, at the time he received his next paycheck, a customer still did not have enough money to cover the check, he could renew the loan by making another payment of 15% of the amount of the original loan. The customer continued to make these 15% payments until the check was cashed.

The annual interest rate on payday loans generally exceeds 400%; therefore, absent statutory authorization, such loans are usurious. Payday loans were authorized by former N.C. Gen. Stat. § 53-281, which expired on 31 August 2001. The next day, 1 September 2001, defendant "Advance Til Payday" reopened as defendant "Advance Internet." The key issue raised by plaintiff's summary judgment motion was whether the evidence established, as a matter of law, that defendants offered loans at usurious interest rates after 31 August 2001.

Advance Internet transactions share many substantive features of the deferred deposit loans offered by Advance Til Payday. As with payday loans, the Advance Internet customer (1) shows proof of employment and of a checking account; (2) receives an immediate cash payment; and (3) is obligated to repay both the cash advance and periodic accrued payments. The Advance Internet customer is liable for this debt until he either makes payments of 20% of the original cash advance every two weeks for a year;[1] or repays the cash advance and all accrued periodic payments. In these respects, the new contract is essentially the same as a payday loan, except that the fees are 20% rather than 15%.

The only difference between check-cashing loans offered by Advance Til Payday and the Advance Internet transactions is that Advance Internet customers now execute documents purporting to be for internet service. To obtain an immediate cash advance, an Advance Internet customer must sign a contract stating that he is

---

1. Thus, a customer who cannot repay the cash advance as a lump sum will have to make 26 payments of 20% of the cash amount, or $520 on a $100 cash advance.

subscribing to a year of "internet access," and another document stating that the cash payment is not a loan. This contract, in addition to obligating the customer to repay the cash advance and periodic fees, also allows him to use defendants' office computers for a few hours a week, and to make limited use of other office equipment to fax or scan documents.

On the basis of these additional features of the new contracts, defendants contend that they are now "internet service providers" offering legitimate contracts for provision of internet services. They call the immediate cash advance a "rebate" on the "internet services" contract, and describe the periodic fees of $40-$100 a month as the price for "internet access." However, this Court does not have to accept defendants' characterization of these transactions, for "if the form of the transaction is a subterfuge to conceal an exaction of more than the legal rate of interest on what is in fact a loan and not a sale, the transaction will be regarded according to its true character and will be held usurious." *Bank v. Merrimon*, 260 N.C. 335, 338, 132 S.E.2d 692, 694 (1963) (citing *Ripple*, 193 N.C. 422, 137 S.E. 156). Accordingly, we next examine the competent record evidence, bearing in mind that in responding to a summary judgment motion, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." N.C. Gen. Stat. § 1A-1, Rule 56(e) (2003).

Uncontradicted evidence establishes that:

1. As Advance Til Payday, defendants offered high interest short term loans. Their advertising emphasized "instant cash." Advance Internet's flyers, store signs, and other advertising continued to focus on the immediate cash, and Advance Internet is still listed under "Loans" in some Yellow Pages.

2. Advance Internet continued to use most of the same stores and to employ many of the same people as did Advance Til Payday. Advance Internet also serves many of the same customers as Advance Til Payday.

3. More than 20 affidavits were submitted from Advance Internet customers stating that he or she had signed an Advance Internet contract solely to obtain immediate cash, and not to have computer access. These affidavits were corroborated by

a phone survey of Advance Internet customers, and by testimony of certain Advance Internet managers and employees. No evidence was offered that any person had ever patronized Advance Internet to obtain internet service[s].

4. An Advance Internet customer must show proof of employment and of a checking account. The amount of cash he receives is determined by reference to the customer's income, rather than his need for computer services.

5. Under Advance Internet contracts, a customer (1) obtains instant cash; (2) is obligated either to pay 20% of the cash amount every two weeks for a year, or else pay back the cash advance and all accrued periodic payments; and (3) generally authorizes defendant to debit his checking account if he is delinquent in these payments.

We conclude that the undisputed evidence of defendants' advertising and business practices "supports the trial court's finding that [defendants'] sale of Internet service is merely a guise for its operation as a small loan business." *Short on Cash.net*, 811 N.E.2d at 826.

We have also considered the scant monetary value of the purported "internet service" offered by defendants. Undisputed record evidence shows that legitimate internet service providers charge less than ten cents an hour for 24 hour a day/7 day a week internet access from a customer's home computer, and access to certain services such as "web-mail" from any computer with internet access. Defendants, on the other hand, charge 100 times more ($10.00 an hour) for very limited internet access a few hours a week, available only on defendants' office computers, and only by appointment during defendants' business hours. Moreover, North Carolina public libraries offer free access to the internet.

Defendants contend that their charges for internet access are substantially similar to those of other private entities where individuals pay for hourly computer access. However, at such establishments, customers receive the benefit of the contracted-for product, per-hour computer access. As regards Advance Internet contracts, the substance of the "product" is the "cash rebate". And customers who want hourly computer access at other private entities are not required to execute a one-year contract requiring repeated payments on a "rebate". Defendants basically argue that their contracts are the equivalent of agreements between consumers and other private enti-

ties because the actual per-hour charges are substantially similar. We conclude that this argument is untenable, and that no meaningful comparison can be made between the arrangements at issue and per-hour computer access at other private entities.

Defendants also characterize the monies received by its customers as "cash rebates." Black's Law Dictionary defines "rebate" as "[a] return of part of a payment, serving as a discount or reduction." BLACK'S LAW DICTIONARY 1295 (8th ed. 2004). However, the monies provided to defendants' consumers do not represent a "return" or a "discount" or a "reduction" of anything. Instead, the "cash rebates" stand alone, and are not related or associated with any "payment" for something of real value. *See Short on Cash.net*, 811 N.E.2d at 825 (applying similar reasoning).

We conclude that the fair market value of Advance Internet contracts is negligible or zero, and that the evidence suggests no rational reason to contract with defendant, except to get immediate cash.

To review, in return for immediate cash, Advance Internet customers must repay both the sum advanced and an additional fee of at least 20% of the amount of cash received. The "internet access" that is the ostensible subject of the contract has little or no monetary value. We conclude that, notwithstanding the facial resemblance to internet service contracts, it is transparently obvious that defendants are offering loans, not *bona fide* internet service contracts. Further, the dollar amount of the periodic payments, when calculated as interest, reveals that the annual rate of interest on these loans is greatly in excess of the maximum permitted under North Carolina law. Such transactions meet the definition of loans offered at usurious interest rates.

Defendants nevertheless argue that the determination of whether their internet service contracts constitute disguised loans is an issue of fact that must be decided by a jury. "Where there are genuine, conflicting issues of material fact, the motion for summary judgment must be denied so that such disputes may be properly resolved by the jury as the trier of fact." *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 468, 597 S.E.2d 674, 694 (2004) (citation omitted). "Determining what constitutes a genuine issue of material fact requires consideration of whether an issue is supported by substantial evidence." *Eason v. Union Cty.*, 160 N.C. App. 388, 391, 585 S.E.2d 452, 455 (2003) (citing *Dewitt v. Eveready Battery Co., Inc.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002)). " 'Substantial evidence is such relevant evidence as

STATE ex rel. COOPER v. NCCS LOANS, INC.

[174 N.C. App. 630 (2005)]

a reasonable mind might accept as adequate to support a conclusion,'
and means 'more than a scintilla or a permissible inference[.]' ''
*Dewitt*, 355 N.C. at 681, 565 S.E.2d at 146 (quoting *Thompson v.
Board of Education*, 292 N.C. 406, 414, 233 S.E.2d 538, 544 (1977), and
*Utilities Commission v. Trucking Co.*, 223 N.C. 687, 690, 28 S.E.2d
201, 203 (1943)) (citation omitted). In the instant case, the uncontra-
dicted material facts provide no basis for a reasonable fact-finder to
conclude the Advance Internet contracts were anything other than
short-term loans. Because the evidence presents no genuine issue
of material fact, the court's summary judgment order constituted a
ruling on a question of law.

In reaching this conclusion, we reject defendants' argument that
plaintiff must show that in "each and every" transaction, defendant(s)
and the customer had the specific "corrupt intent" to enter into a usu-
rious loan agreement. The law is clear that the "corrupt intent
required to constitute usury is simply the intentional charging of
more for money lent than the law allows. Where the lender intention-
ally charges the borrower a greater rate of interest than the law
allows and his purpose is clearly revealed on the face of the instru-
ment, a corrupt intent to violate the usury law on the part of the
lender is shown." *Kessing*, 278 N.C. at 530, 180 S.E.2d at 827. Further,
in none of the cases cited by defendants is the borrower's intent at
issue. We also note that this plaintiff's claim is based, not on the per-
sonal intentions of individuals, but on defendants' ongoing pattern
and practice of executing thousands of essentially identical usurious
loan contracts. "Uniform contracts, like all other contracts, must con-
form to law." *Crow v. Citicorp Acceptance Co.*, 319 N.C. 274, 286, 354
S.E.2d 459, 467 (1987).

Defendants also attach great significance to the issue of whether
some customers actually used defendants' computers. Defendants
assert that competent record evidence suggests that up to 25% of its
customers used their internet services. This assertion is based on the
affidavit and deposition testimony of an Advance Internet regional
manager, who stated that a fourth of their customers used the com-
puters. This witness conceded that log books were not required
before May 2003; that her personal knowledge did not extend beyond
the five stores in her region; that she did not know how many hours
a week the computers were used; and that she based her opinion on
"flipping through" stacks of contracts and glancing at the rebate level
of different contracts. This testimony does little to help defendants
survive summary judgment because, as discussed above, a customer's

STATE ex rel. COOPER v. NCCS LOANS, INC.

[174 N.C. App. 630 (2005)]

contractual right to make limited use of defendants' office computers has, at most, a negligible fair market value. Therefore, if some customers used defendants' computers to access the internet, this does not change the reality that such use was incidental to the central purpose of obtaining a cash loan.

We conclude that the evidence establishes as a matter of law (1) that defendants executed contracts for usurious loans, not legitimate sales contracts, and (2) that there is no evidentiary basis upon which a reasonable fact-finder could reach a contrary conclusion. Accordingly, the trial court did not err by entering summary judgment for plaintiff on its claims of usury and violation of the Consumer Finance Act.

[2] Defendants argue next that the trial court erred by granting summary judgment on plaintiff's claim of unfair or deceptive trade practices. We disagree.

"In order to establish a *prima facie* claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001) (citing *Spartan Leasing Inc. v. Pollard*, 101 N.C. App. 450, 460, 400 S.E.2d 476, 482 (1991)). "The determination of whether an act or practice is an unfair or deceptive practice that violates N.C.G.S. § 75-1.1 is a question of law for the court." *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000) (citation omitted).

> [A] practice is deceptive if it has the tendency to deceive. . . . '[A] practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.' . . . Moreover, where a party engages in conduct manifesting an inequitable assertion of power or position, such conduct constitutes an unfair act or practice.

*Id.* (quoting *Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981), and citing *Johnson v. Beverly-Hanks & Assoc.*, 328 N.C. 202, 208, 400 S.E.2d 38, 42 (1991)).

Defendants herein assert that, if one assumes that their customers knew they were executing contracts for a loan rather than internet service, then defendants' conduct was not "deceptive."

However, "[p]roof of actual deception is not necessary; it is enough that the statements had the capacity to deceive." *Pinehurst, Inc. v. O'Leary Bros. Realty*, 79 N.C. App. 51, 59, 338 S.E.2d 918, 923 (1986) (citation omitted). We observe that defendants did not inform consumers that they were executing documents in violation of North Carolina's Consumer Finance Act. On all the facts of this case, we conclude that defendants' contracts "had the capacity to deceive."

Moreover, "violations of statutes designed to protect the consuming public and violations of established public policy may constitute unfair and deceptive practices." *Stanley v. Moore*, 339 N.C. 717, 723, 454 S.E.2d 225, 228 (1995). In this regard, we note that it is a "paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws." N.C. Gen. Stat. § 24-2.1 (2003). Defendants' practice of offering usurious loans was a clear violation of this policy. We conclude that the trial court did not err by ruling as a matter of law that this constitutes unfair or deceptive trade practices, in violation of N.C. Gen. Stat. § 75-1.1 (2003).

**[3]** Defendants argue next that the court erred by decreeing that "Advance Internet rebate contracts with North Carolina consumers [were] cancelled pursuant to N.C. Gen. Stat. § 75-15.1," and by requiring "all funds collected by the defendants pursuant to such contracts . . . be refunded to consumers." We disagree.

The trial court's order is clearly authorized by statute. N.C. Gen. Stat. § 53-166(d) (2003) provides in relevant part that any loan made in violation of the statute "shall be void and the licensee or any other party in violation shall have no right to collect, receive or retain any principal or charges whatsoever with respect to such loan." And, under N.C. Gen. Stat. § 24-2 (2003), the penalty for charging a higher interest rate than permitted by law is "forfeiture of the entire interest . . . which has been agreed to be paid thereon."

Defendants' primary argument is that, because the evidence raised genuine issues of material fact regarding the nature of their contracts, the trial court erred by ordering the contracts voided and money refunded to their customers. Having concluded that the trial court did not err by granting summary judgment for plaintiffs, we necessarily have resolved this issue against defendants. Defendants also argue that the court was required to apportion the defendants' refund of "funds collected by the defendants pursuant to [Advance Internet] contracts" rather than impose what amounts to joint and several

liability on them. However, defendants offer no argument or authority to support this position. *See* N.C.R. App. P. 28 (b)(6) ("Assignments of error not set out in appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned.").

**[4]** Defendants next argue that the trial court erred by allowing John Gill to be named as a defendant, and by entering summary judgment against him individually. We disagree.

First, defendants never appealed the order allowing Gill's addition as a defendant. " 'Without proper notice of appeal, the appellate court acquires no jurisdiction and neither the court nor the parties may waive the jurisdictional requirements even for good cause shown under Rule 2.' " *Sillery v. Sillery*, 168 N.C. App. 231, 234, 606 S.E.2d 749, 751 (2005) (quoting *Bromhal v. Stott*, 116 N.C. App. 250, 253, 447 S.E.2d 481, 483 (1994)). Defendants argue that despite their failure to appeal from the order adding Gill as a defendant, this Court has jurisdiction to review the order under N.C. Gen. Stat. § 1-278 (2003). G.S. § 1-278 states that on appeal, "the court may review any intermediate order involving the merits and necessarily affecting the judgment." However, "G.S. 1-278 permits us, incident to an appeal from a final judgment or order, to review intermediate orders[.]" *In re Foreclosure of Allan & Warmbold Constr. Co.*, 88 N.C. App. 693, 696, 364 S.E.2d 723, 725 (1988) (emphasis added). Defendants cite no authority for the proposition that G.S. § 1-278 requires us to review an interlocutory order, and we find none. We conclude that defendants failed to preserve this issue for review.

Secondly, our review of the record makes it clear that the trial court did not err by allowing plaintiff's motion to amend its complaint. Defendants argue that the trial court erred because the motion for amendment did not assert any grounds upon which Gill might be personally liable for corporate acts. Defendants cite N.C. Gen. Stat. § 57C-3-30 (2003), in support of their position. The statute provides, in pertinent part, that:

    (a) A person who is a member, manager, director, executive, or any combination thereof of a limited liability company is not liable for the obligations of a limited liability company **solely** by reason of being a member, manager, director, or executive and does not become so by participating, in whatever capacity, in the management or control of the business. A member, manager, director, or executive **may, however,**

**become personally liable by reason of that person's own acts or conduct.**

(b) A member of a limited liability company is not a proper party to proceedings by or against a limited liability company[.] . . .

N.C. Gen. Stat. § 57C-3-30(a) and (b) (2003) (emphasis added). Thus, regardless of whether Section 57C-3-30(b) restricts the circumstances in which a member of a limited liability company (LLC) may be added as a party to a lawsuit, Section 57C-3-30(a) clearly anticipates that a member who is also a "manager, director, executive, or any combination thereof" might be made a defendant and "become personally liable by reason of [his] own acts or conduct."

In the instant case, plaintiff's motion to add Gill as a defendant asserted that NCCS, Loans, Inc. and JAG N.C., LLC were "entirely owned and controlled" by Gill, who also managed and controlled JAGJRTX, LLC; that defendants tried to evade complying with plaintiff's discovery requests by shifting ownership of Advance Internet from JAGJRTX, LLC, to JAG N.C.; and that "Gill may continue to create shell entities in an attempt to evade liability[.]" Plaintiff also submitted a proposed amended complaint alleging that "Gill is the organizer, managing member and principal operator of JAG, NC, LLC" and that "Gill has directed, and is responsible for, all the unlawful practices alleged in this complaint." (emphasis added). We conclude that these allegations of Gill's "own acts and conduct" were sufficient to allow his addition as a party defendant. "A motion to amend pleadings is addressed to the sound discretion of the trial court; the trial court's ruling is not reviewable absent a showing of an abuse of discretion." *Warren v. Gen. Motors Corp.*, 142 N.C. App. 316, 319, 542 S.E.2d 317, 319 (2001) (citing *Haas v. Kelso*, 76 N.C. App. 77, 80, 331 S.E.2d 759, 761 (1985)). We conclude that the trial court did not abuse its discretion by granting plaintiff's motion to add Gill as a defendant.

Defendants also argue that the trial court erred by granting summary judgment against Gill, again on the grounds that there was no evidence that would subject him to personal liability. We disagree.

Under N.C. Gen. Stat. § 1A-1, Rule 8(d) (2003), "[a]verments in a pleading to which a responsive pleading is required . . . are admitted when not denied in the responsive pleading." In the instant case, plaintiff's amended complaint alleged that "Gill has directed, and is

responsible for, all the unlawful practices alleged in this complaint." Gill failed to file an answer to the complaint.

We note that "for purposes of summary judgment, a defendant's failure to file answer does *not* constitute a conclusive admission of the allegations in a plaintiff's complaint so as to preclude such defendant from offering affidavits or testimony in opposition to the motion." *Bell v. Martin*, 299 N.C. 715, 720, 264 S.E.2d 101, 104-05 (1980). Accordingly, Gill had the right to offer evidence opposing summary judgment, notwithstanding his failure to file an answer.

However, Gill offered no evidence contradicting plaintiff's assertion that he directed and controlled the illegal activities of the corporate defendants. We conclude that, because defendant neither filed an answer nor submitted any evidence contradicting the allegations of plaintiff's complaint, he is deemed to have admitted the allegation in the complaint that "Gill has directed, and is responsible for, all the unlawful practices alleged in this complaint." We further conclude that the trial court did not err by entering summary judgment against Gill individually.

For the reasons discussed above, we conclude that the trial court did not err by entering summary judgment for plaintiffs, and that the trial court's order should be

Affirmed.

Judges WYNN and CALABRIA concur.