Can-Dev, ULC v. SSTI Centennial, LLC, 2018 NCBC 9.

STATE OF NORTH CAROLINA

FORSYTH COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 6784
MASTER FILE
(related cases 15 CVS 6785; 15 CVS 6786;
15 CVS 6787)

CAN-DEV, ULC,

        Plaintiff,

v.

SSTI CENTENNIAL, LLC; SSTI
MAVIS MISSISSAUGA, LLC; SSTI
BREWSTER BRAMPTON, LLC; and
SSTI GRANITE PICKERING, LLC,

        Defendants.

**ORDER AND OPINION ON
DEFENDANTS' PARTIAL MOTION
TO DISMISS**

1.     **THIS MATTER** is before the Court on Defendants' Partial Motion to Dismiss (the "Motion"). Having considered the Motion, the briefs, and the arguments of counsel at a hearing on the Motion, the Court hereby **DENIES** the Motion.

> *Kilpatrick Townsend & Stockton LLP, by David C. Smith, Dustin T. Greene, and Elizabeth L. Winters, for Plaintiff.*
>
> *Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by Kirk G. Warner, Clifton L. Brinson, Jang ("John") H. Jo, and John E. Harris, for Defendants.*

Robinson, Judge.

## I.   PROCEDURAL HISTORY

2.     The Court sets forth here only those portions of the procedural history that are relevant to its determination of the Motion.

3. On November 4, 2015, Plaintiff Can-Dev, ULC ("Plaintiff") initiated four separate declaratory judgment actions against each Defendant, which were consolidated by order dated January 31, 2017.

4. On August 15, 2017, Plaintiff filed its First Amended Complaint, adding its members James Bennett ("Bennett") and Reade DeCurtins ("DeCurtins") as plaintiffs and asserting additional claims for relief.

5. This case was designated as a mandatory complex business case by order of the Chief Justice of the Supreme Court of North Carolina dated August 16, 2017 and assigned to the undersigned by order of Chief Business Court Judge James L. Gale that same day.

6. On September 18, 2017, Defendants filed the Motion pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)") and a brief in support.

7. On November 17, 2017, Bennett and DeCurtins voluntarily dismissed with prejudice all of their claims against Defendants.

8. The Court held a hearing on the Motion on December 19, 2017, at which counsel for all parties were present.

9. The Motion has been fully briefed and is now ripe for resolution.

## II. FACTUAL BACKGROUND

10. The Court does not making findings of fact on a motion to dismiss for failure to state a claim but recites only those factual allegations of the First Amended

Complaint and portions of the documents referenced therein that are relevant and necessary to the Court's determination of the Motion.

A.    **The Parties**

11.    Plaintiff is a Nova Scotia unlimited liability company that maintains its offices and principal place of business in Forsyth County, North Carolina.  (First Am. Compl. ¶ 1, ECF No. 4.)  Bennett and DeCurtins are Plaintiff's sole members.  (First Am. Compl. ¶ 2.)

12.    Defendants SSTI Centennial, LLC ("Centennial"), SSTI Mavis Mississauga, LLC ("Mavis"), SSTI Brewster Brampton, LLC ("Brewster"), and SSTI Granite Pickering, LLC ("Granite") (collectively, the "Defendants") are Delaware limited liability companies that maintain their principal places of business in California.  (First Am. Compl. ¶ 3.)  Defendants are commonly owned and operated as part of SmartStop, a self-storage conglomerate.  (First Am. Compl. ¶ 4.)  Michael Schwartz ("Schwartz"), a non-party to this action, is SmartStop's president, CEO, and chairman of the board.  (First Am. Compl. ¶ 8.)

B.    **Plaintiff and Defendants Enter a Business Relationship**

13.    In 2010, at a trade show in Las Vegas, Schwartz solicited Bennett and DeCurtins to assist in expanding SmartStop into the Canadian market because of their prior experience with, and business contacts in, the Toronto area.  (First Am. Compl. ¶¶ 6–8.)  Prior to 2010, Bennett and DeCurtins ran a successful real estate business for years and had experience as consultants assisting property owners with

all aspects of the planning and development of self-storage properties. (First Am. Compl. ¶ 5.)

14. As part of the agreement between Schwartz, on the one hand, and Bennett and DeCurtins, on the other, and at SmartStop's request, Budget Development International, LLC ("BDI"), of which Bennett is president, and Strategic Storage Holdings, LLC ("SSH"), of which Schwartz is president, executed a Joint Venture Agreement ("JVA") in March 2011. (First Am. Compl. ¶ 10; Ex. A to Stipulation, at 1, 10, ECF No. 83.1; Reply Br. Supp. Defs.' Partial Mot. Dismiss ["Defs.' Reply Br."] Ex. 1, at 4, ECF No. 73.2.) The JVA was to govern the development of self-storage projects in Canada. (First Am. Compl. ¶ 10.) Pursuant to the JVA, SmartStop formed Defendants—four property holding companies, one for each project. (First Am. Compl. ¶ 11.) Plaintiff alleges that it was formed to be the operating development company for the projects and that the JVA called for the execution of separate Development Services Agreements ("DSAs") between Plaintiff and each of the four Defendant-companies. (First Am. Compl. ¶ 11.) A pro forma for the DSA was attached to the JVA. (Ex. C to Ex. A to Stipulation.)

15. The DSAs, which were drafted by Defendants, provided that, in return for assisting Defendants with the development of the properties, Plaintiff was to receive a development fee of $300,000 for each property, to be paid at specified intervals as development of the properties progressed. (First Am. Compl. ¶¶ 17–18; *see also* Answer First Am. Compl. & Countercl. Against Can-Dev, ULC Exs. 1–4, § 3.1, ECF No. 54 ["Answer"].) The DSAs further provided that Plaintiff would be compensated

by what Plaintiff characterizes as "equity" in the properties "in the form of rights to future income from the operation and/or sale of the [p]roperties." (First Am. Compl. ¶¶ 17–18; *see also* Answer Exs. 1–4, §§ 3.3–3.4.) Section 3.3 of the DSAs granted Plaintiff the right to receive a percentage of net cash flows, which were to be distributed first to Defendants' sole member until it had received a 12% return on its capital contributions and intercompany loans, and then to Defendants' sole member and Plaintiff in 80% and 20% shares, respectively. (Answer Exs. 1–4, § 3.3.) Net capital proceeds were to be divided in the same manner as net cash flows and were to be distributed within thirty days of any capital transaction. (Answer Exs. 1–4, § 3.4.)

16.     The DSAs also gave Defendants an option to buy out Plaintiff's rights to participate in net cash flows and net capital proceeds. (Answer Ex. 1, Amendment No. 1, § 3.5, Exs. 2–4, § 3.5.) Under the terms of the DSAs, Defendants could exercise the buyout option four years after a property became operational by giving Plaintiff written notice. (Answer Ex. 1, Amendment No. 1, § 3.5(a), Exs. 2–4, § 3.5(a).) Defendants would then have thirty days to retain an independent certified appraiser to determine the property's fair market value, which value was to be used to determine the exercise price of the buyout. (Answer Ex. 1, Amendment No. 1, § 3.5(a), Exs. 2–4, § 3.5(a).) The exercise price was to be 20% of the appraised value minus: (1) the capital contributions of Defendants' sole member plus a 12% return on its capital contributions; (2) the amount of any additional capital expenditures incurred by Defendants with respect to the property plus a 12% return on such expenditures;

(3) the principal balance of intercompany loans plus a 12% return on such loans; and (4) the aggregate principal amount of mortgage debt secured by the property. (Answer Ex. 1, Amendment No. 1, § 3.5(b), Exs. 2–4, § 3.5(b).) Payment of the exercise price to Plaintiff would terminate Plaintiff's rights to receive any share of the net cash flows and net capital proceeds. (Answer Ex. 1, Amendment No. 1, § 3.5(c), Exs. 2–4, § 3.5(c).)

17. Development of the Mavis project began after BDI and SSH executed the JVA. (First Am. Compl. ¶ 10.) On March 14, 2011, Plaintiff and Mavis entered into a DSA to govern the development of real property into a self-storage facility. (First Am. Compl. ¶ 12; *see also* Answer Ex. 1.) Plaintiff and Brewster thereafter entered into a DSA in 2011, although the exact date is not stated on the DSA. (*See* First Am. Compl. ¶ 15; Answer Ex. 2, at 1.)

18. Plaintiff alleges that it invested significant time, effort, and resources to develop the properties, and that the parties knew that most of Plaintiff's work was front loaded, meaning that Plaintiff's efforts were visible largely at the beginning of development, in selecting sites, planning, obtaining permits and zoning approvals, identifying and hiring contractors, and other pre-construction tasks necessary to make the projects successful in the long term. (First Am. Compl. ¶¶ 22–23.) Plaintiff alleges that the projects were developed on time and within budget and that Defendants repeatedly praised Plaintiff's work and the pace of the projects' development and expressed no dissatisfaction with Plaintiff's services. (First Am. Compl. ¶¶ 23–26.)

19. Plaintiff alleges that in March 2013, SmartStop insisted that a Joint Venture Termination Agreement ("JVTA") be executed and that development of the projects proceed solely under the DSAs. (First Am. Compl. ¶ 13; *see also* Defs.' Reply Br. Ex. 1.) Bennett and DeCurtins agreed to execute the JVTA based on assurances that the DSAs and all rights thereunder would remain effective. (First Am. Compl. ¶ 13.) Plaintiff alleges that execution of the JVTA had no practical effect on the parties' relationship, which functioned exactly as it had before. (First Am. Compl. ¶ 14.)

20. Plaintiff alleges that Can-Dev subsequently executed DSAs with Granite and Centennial. (First Am. Compl. ¶ 15.) The Granite DSA had an effective date of August 28, 2013, (Answer Ex. 3, at 1), and the Centennial DSA had an effective date of April 2, 2014, (Answer Ex. 4, at 1).

## C. SmartStop Takes Over Development of Granite and Centennial

21. Plaintiff alleges that in May 2015, Schwartz told Bennett and DeCurtins that SmartStop wanted to assume control over the remaining development of the Granite and Centennial projects, to which Bennett and DeCurtins agreed on the condition that the DSAs would remain in place with Plaintiff retaining its right to development fees and to share in net cash flows and net capital proceeds. (First Am. Compl. ¶ 27.) Schwartz agreed and Plaintiff ceased active development of the Granite and Centennial projects, giving Defendants complete control over all four projects as the Mavis and Brewster projects had been successfully developed by November 2014. (First Am. Compl. ¶¶ 23–28.)

**D.      SmartStop Claims Defendants Are Being Sold to a Third Party**

22.      Plaintiff alleges that in July 2015, Schwartz told Bennett and DeCurtins that Defendants were being sold to Strategic 1031, LLC and presented Plaintiff with a Development Services Termination Agreement ("DSTA") that would have terminated the DSAs and Plaintiff's rights thereunder.  (First Am. Compl. ¶ 31.) Plaintiff alleges that Defendants offered to accelerate payment of the development fees owed to Plaintiff under the DSAs in exchange for Plaintiff's execution of the DSTA.  (First Am. Compl. ¶ 32.)

23.      Plaintiff alleges that it then discovered that Strategic 1031 was also owned by Schwartz, making Strategic 1031 an affiliate of Defendants under the terms of the DSAs.  (First Am. Compl. ¶ 33; Answer Exs. A to Exs. 1–4.)  Because a sale of Defendants to an affiliate would not terminate Plaintiff's rights under the DSAs, Plaintiff alleges that it requested that SmartStop provide financial information about the four properties so that Plaintiff could evaluate its rights.  (First Am. Compl. ¶¶ 33–34.)  SmartStop allegedly refused to provide the requested information, and Plaintiff refused to sign the DSTA.  (First Am. Compl. ¶ 34.)

24.      The First Amended Complaint alleges that Defendants then told Plaintiff that another sale was pending to transfer ownership of Defendants to an independent third-party buyer, but refused to disclose the identity of the buyer to Plaintiff causing Plaintiff to again refuse to execute the DSTA.  (First Am. Compl. ¶ 36.)

### E.     Mavis Issues a Buyout Notice

25.    Plaintiff alleges that on March 1, 2016, Schwartz sent Plaintiff a notice purporting to trigger the buyout provision of the Mavis DSA and claiming that Plaintiff was not owed any amount thereunder.  (First Am. Compl. ¶ 41.)  The First Amended Complaint alleges that the buyout notice included amounts that were not provided for by the Mavis DSA, and the buyout notice's calculations were based on appraisals that had been conducted several months earlier, rather than within thirty days of when the buyout option was triggered as required by the DSAs.  (First Am. Compl. ¶ 42.)  Plaintiff also alleges that Defendants manipulated the finances of the projects to avoid paying any additional amounts to Plaintiff under sections 3.3 to 3.5 of the DSAs.  (First Am. Compl. ¶ 51.)

26.    Plaintiff alleges that it again requested information about the projects' operations and Mavis's calculation of the exercise price, which Defendants refused to provide.  (First Am. Compl. ¶ 43.)  Plaintiff also alleges that it requested a recalculation of the exercise price based on a current appraisal, but Defendants ignored this request.  (First Am. Compl. ¶ 44.)

27.    Plaintiff further alleges that it later learned that the second purported third-party buyer was Fir Tree Partners ("Fir Tree").  (First Am. Compl. ¶ 48.)  Although Defendants' last e-mail with Fir Tree was dated August 11, 2015, Mavis was still attempting to exercise its buyout option as late as March 2016.  (First Am. Compl. ¶ 49; *see also* First Am. Compl. ¶ 41.)

## F.     Plaintiff's Claims

28.     Plaintiff brings claims against all Defendants for breach of fiduciary duty, constructive fraud, breach of contract, breach of the duty of good faith and fair dealing, unjust enrichment, defamation, unfair and deceptive trade practices ("UDTP"), a declaratory judgment, and punitive damages.  (First Am. Compl. 10–15.) Plaintiff later voluntarily dismissed its defamation claim pursuant to Rule 41(a). (ECF Nos. 68, 77.)  Defendants seek dismissal of Plaintiff's claims for breach of fiduciary duty, constructive fraud, unjust enrichment, UDTP, and punitive damages. (Defs.' Partial Mot. Dismiss 1–2, ECF No. 52.)

## III.    LEGAL STANDARD

29.     In ruling on a motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, the Court reviews the allegations of the First Amended Complaint in the light most favorable to Plaintiff.  The Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory." *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). The Court construes the First Amended Complaint liberally and accepts all allegations as true.  *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009).

30.     Where the pleading refers to and depends on certain documents, the Court may consider those documents without converting the motion into one for summary judgment under Rule 56.  *Schlieper v. Johnson*, 195 N.C. App. 257, 261, 672 S.E.2d

548, 551 (2009). At the same time, the Court may not consider materials that are not mentioned, contained, or attached in or to the pleading; otherwise, a Rule 12(b)(6) motion will be converted into a Rule 56 motion and subject to its standards of consideration and review. *Fowler v. Williamson*, 39 N.C. App. 715, 717, 251 S.E.2d 889, 890−91 (1979).

31. Dismissal of a claim pursuant to Rule 12(b)(6) is proper "(1) when the complaint on its face reveals that no law supports [the] claim; (2) when the complaint reveals on its face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats the . . . claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985); *see also Jackson v. Bumgardner*, 318 N.C. 172, 175, 347 S.E.2d 743, 745 (1986). Otherwise, "a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970) (emphasis omitted).

32. The Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005). A "trial court can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Laster*, 199 N.C. App. at 577, 681 S.E.2d at 862. The Court can also ignore a party's legal conclusions set forth in its pleading. *McCrann v. Pinehurst, LLC*, 225 N.C. App. 368, 377, 737 S.E.2d 771, 777 (2013).

## IV.   ANALYSIS

### A.   Breach of Fiduciary Duty

33.   "For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). "Such a relationship has been broadly defined by this Court as one in which there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . . ." *Id.* at 651–52, 548 S.E.2d at 707 (quotation marks omitted). "In North Carolina, a fiduciary duty can arise by operation of law (*de jure*) or based on the facts and circumstances (*de facto*) . . . ." *Lockerman v. S. River Elec. Membership Corp.*, 794 S.E.2d 346, 351 (N.C. Ct. App. 2016). A *de jure* fiduciary relationship arises as a result of legal relations, such as the relationship between an attorney and client. *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 293, 603 S.E.2d 147, 155 (2004). A *de facto* fiduciary relationship "extends to any possible case in which a fiduciary relation exists in fact, and in which there is a confidence reposed on one side, and resulting domination and influence on the other[.]" *Lockerman*, 794 S.E.2d at 351.

### 1.   *De Jure* Fiduciary Relationship

34.   Plaintiff argues that a *de jure* fiduciary relationship existed because the parties formed a joint venture to develop four self-storage facilities. (Pl.'s Resp. Defs.' Partial Mot. Dismiss 9, ECF No. 69 ["Pl.'s Br. Opp'n"].)

35.     "A joint venture is a business association like a partnership but narrower in scope and purpose." *Lake Colony Constr., Inc. v. Boyd*, 212 N.C. App. 300, 305, 711 S.E.2d 742, 746 (2011) (quotation marks omitted).

> Our Supreme Court has characterized a joint venture as "an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, but without creating a partnership in the legal or technical sense of the term."

*Id.* (quoting *Pike v. Wachovia Bank & Tr. Co.*, 274 N.C. 1, 8, 161 S.E.2d 453, 460 (1968)).  The essential elements of a joint venture are "(1) an agreement to engage in a single business venture with the joint sharing of profits, (2) with each party to the joint venture having a right in some measure to direct the conduct of the other through a necessary fiduciary relationship." *Se. Shelter Corp. v. BTU Corp.*, 154 N.C. App. 321, 327, 572 S.E.2d 200, 204 (2002) (emphasis, citations, and quotation marks omitted).  The agreement to create a joint venture need not be express, but can be inferred by the parties' conduct and the surrounding circumstances. *Azalea Garden Bd. & Care, Inc. v. Vanhoy*, 2009 NCBC LEXIS 2, at *16 (N.C. Super. Ct. Mar. 17, 2009) (citing *Rhue v. Rhue*, 189 N.C. App. 299, 307, 658 S.E.2d 52, 59 (2008); *Wike v. Wike*, 115 N.C. App. 139, 141, 445 S.E.2d 406, 407 (1994)).  "The second element requires that the parties to the agreement stand in the relation of principal, as well as agent, as to one another[,]" *Se. Shelter Corp.*, 154 N.C. App. at 327, 572 S.E.2d at 204–05, but "does not require that the parties have the right to control the conduct of each other in all aspects of the project[,]" *Lake Colony Constr., Inc.*, 212 N.C. App. at 308, 711 S.E.2d at 748.

36.     As to Plaintiff's argument that the parties' joint venture created a *de jure* fiduciary relationship, the Court believes that it can properly resolve the Motion as to Plaintiff's breach of fiduciary duty claim without determining whether a *de jure* fiduciary relationship exists between the parties as the result of either an express or implied agreement. Under the allegations of the First Amended Complaint, the Court believes Plaintiff has adequately alleged the existence of a *de facto* fiduciary relationship.

### 2.     *De Facto* Fiduciary Relationship

37.     Because our "[c]ourts have historically declined to offer a rigid definition of a fiduciary relationship in order to allow imposition of fiduciary duties where justified[,]" fiduciary relationships "can arise in a variety of circumstances, and may stem from varied and unpredictable facts." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 588, 403 S.E.2d 483, 489 (1991) (citation omitted). However, "[t]he standard for finding a *de facto* fiduciary relationship is a demanding one: Only when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen." *Lockerman*, 794 S.E.2d at 352 (quotation marks omitted). Domination and influence are essential components of any fiduciary relationship. *Dalton*, 353 N.C. at 652, 548 S.E.2d at 708. Whether a fiduciary relationship exists depends on the particular facts and circumstances of a given case. *Highland Paving Co. v. First Bank*, 227 N.C. App. 36, 42, 742 S.E.2d 287,

292 (2013). Thus, whether a *de facto* fiduciary relationship exists "is generally a question of fact for the jury." *Lockerman*, 794 S.E.2d at 351.

38. Defendants argue that Plaintiff has not adequately alleged the existence of a *de facto* fiduciary relationship because Plaintiff has not alleged facts showing that the parties' relationship was anything more than a contractual relationship negotiated at arm's length. (Defs.' Br. Supp. 10.) Defendants contend that the DSAs, which set out the parties' respective rights and obligations in great detail, governed the parties' relationship at all times, and Defendants' assumption of control over the development and management of the four properties did nothing to alter Plaintiff's rights under the DSAs and was not the product of domination and influence over Plaintiff. (Defs.' Br. Supp. 10–11.)

39. Plaintiff argues that it is Defendants' control over the projects, rather than control over Plaintiff, which creates a *de facto* fiduciary relationship, because Defendants' assumption of complete control over the projects and their financial information, which information directly impacted Plaintiff's rights to payment under the DSAs, resulted in Defendants "literally '[holding] all the cards—all the financial power [and] technical information[.]'" (Pl.'s Br. Opp'n 13–15 (second alteration in original) (quoting *Lockerman*, 794 S.E.2d at 352).)

40. Our Court of Appeals has held that "a fiduciary relationship will not exist between parties in equal bargaining positions dealing at arm's length, even though they are mutually interdependent businesses." *Strickland v. Lawrence*, 176 N.C. App. 656, 662, 627 S.E.2d 301, 306 (2006). Similarly, "parties to a contract do not

thereby become each others' fiduciaries; they generally owe no special duty to one another beyond the terms of the contract[.]" *Branch Banking & Tr. Co. v. Thompson*, 107 N.C. App. 53, 61, 418 S.E.2d 694, 699 (1992). Nevertheless, the existence of a contract does not foreclose the possibility that a contracting party may repose trust and confidence in the other party, beyond the terms of the contract, such that the other party, in equity and good conscience, becomes bound to act in good faith and with due regard to the interests of the one reposing confidence. *Cf. Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 368, 760 S.E.2d 263, 267–68 (2014) (noting that although a lender-borrower relationship is typically considered an arm's length relationship that does not give rise to a fiduciary duty, "it is possible, at least theoretically, for a particular bank-customer transaction to give rise to a fiduciary relation given the proper circumstances" (quotation marks omitted)).

41. Defendants' takeover of the development of the Granite and Centennial projects was not provided for in the DSAs, and was thus beyond the terms of the contracts. (*See* Answer Exs. 3–4.) Defendants thereafter had complete authority to make decisions about the future development and operation of the projects and retained all financial information about the projects. (First Am. Compl. ¶ 30.) Thus, Plaintiff's interest in compensation based on net cash flows and net capital proceeds, or in receiving a properly calculated exercise price in the event of a buyout, was entirely controlled by Defendants. Plaintiff alleges that in agreeing to allow Defendants to assume control over all aspects of the projects, Plaintiff reposed special trust and confidence in Defendants. (First Am. Compl. ¶ 30.) Notwithstanding

Defendants' argument that the parties stood in equal bargaining positions, once Plaintiff ceded direct involvement with the projects to Defendants, Plaintiff claims it was no longer in an equal position as Plaintiff had no ability to monitor the projects' development, operations, or finances to protect its own interests. *See Strickland*, 176 N.C. App. at 663, 627 S.E.2d at 306 (finding that no fiduciary relationship existed because, although defendants took over management of a mine in which plaintiffs had a financial interest via a mining lease, plaintiffs actively oversaw the mine, reserved the right to audit the mine's books, and were involved in day-to-day management of the mine). Similarly, Defendants' argument that they did not "hold all of the cards" because Plaintiff could look to the DSAs to enforce its rights ignores the fact that Defendants' takeover was not provided for in the DSAs. Further, the DSAs did not provide any mechanism to resolve disputes regarding the calculation of amounts owed to Plaintiff under the DSAs.

42. The Court concludes, based on the allegations of the First Amended Complaint and the documents referenced therein and assuming all facts and reasonable inferences in Plaintiff's favor, that Plaintiff has sufficiently alleged the existence of a fiduciary relationship to survive a Rule 12(b)(6) motion to dismiss. Therefore, the Motion is denied as to Plaintiff's breach of fiduciary duty claim.

B. **Constructive Fraud**

43. "To survive a motion to dismiss, a cause of action for constructive fraud must allege (1) a relationship of trust and confidence, (2) that the defendant took advantage of that position of trust in order to benefit himself, and (3) that plaintiff

was, as a result, injured." *White*, 166 N.C. App. at 294, 603 S.E.2d at 156; *see also*

*Brissett v. First Mountain Vernon Indus. Loan Ass'n*, 233 N.C. App. 241, 252, 756

S.E.2d 798, 806 (2014). "The primary difference between pleading a claim for

constructive fraud and one for breach of fiduciary duty is the [additional] constructive

fraud requirement that the defendant benefit himself." *White*, 166 N.C. App. at 294,

603 S.E.2d at 156.

44. Defendants' only argument for dismissal of Plaintiff's constructive fraud

claim is that Plaintiff has failed to allege the existence of a fiduciary relationship.

(Defs.' Br. Supp. 12; Defs.' Reply Br. 9, ECF No. 73.) Having concluded that Plaintiff

states a claim for breach of fiduciary duty, the Court further concludes that the

Motion should be denied as to Plaintiff's constructive fraud claim.

## C. <u>Unjust Enrichment</u>

45. "In order to recover on a claim of unjust enrichment, a party must prove

that it conferred a benefit on another party, that the other party consciously accepted

the benefit, and that the benefit was not conferred gratuitously or by an interference

in the affairs of the other party." *Se. Shelter Corp.*, 154 N.C. App. at 330, 572 S.E.2d

at 206. An unjust enrichment claim is a claim in quasi contract or a contract implied

in law. *M Series Rebuild, LLC v. Town of Mount Pleasant*, 222 N.C. App. 59, 67, 730

S.E.2d 254, 260 (2012). "The claim is not based on a promise but is imposed by law

to prevent an unjust enrichment. If there is a contract between the parties the

contract governs the claim and the law will not imply a contract." *Booe v. Shadrick*,

322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988). "Only in the absence of an express

agreement of the parties will courts impose a quasi contract or a contract implied in law in order to prevent an unjust enrichment." *Paul L. Whitfield, P.A. v. Gilchrist*, 348 N.C. 39, 42, 497 S.E.2d 412, 415 (1998). Nevertheless, North Carolina law permits a party to plead claims in the alternative, even though the party may not ultimately be able to prevail on both claims. *James River Equip., Inc. v. Mecklenburg Utils., Inc.*, 179 N.C. App. 414, 419, 634 S.E.2d 557, 560 (2006).

46. Plaintiff alleges an unjust enrichment claim in the alternative to its breach of contract claim, seeking to recover for the benefit it bestowed on Defendants through its work in developing the four self-storage properties. (First Am. Compl. ¶ 78.) Defendants argue that the unjust enrichment claim must be dismissed because the existence of an express contract is undisputed, as Defendants have admitted to the DSAs' validity in their Answer, and the existence of an express contract precludes an unjust enrichment claim. (Defs.' Br. Supp. 12–13; Defs.' Reply Br. 10.)

47. Notwithstanding Defendants' assertion that the Court may treat the existence of a valid contract as undisputed because Defendants have admitted that the DSAs are valid and binding in their Answer, the Court is limited at the 12(b)(6) stage to considering only the allegations of the First Amended Complaint and any documents attached, referred to, or incorporated by reference. *Schlieper*, 195 N.C. App. at 261, 672 S.E.2d at 551; *Fowler*, 39 N.C. App. at 717, 251 S.E.2d at 890−91. Thus, Defendants' Answer may not properly be considered without converting the Motion into a Rule 12(c) motion, which the Court, in its discretion, declines to do. As the Court cannot conclude at the 12(b)(6) stage that the parties entered into a valid,

binding contract so as to preclude Plaintiff's unjust enrichment claim, the Motion is denied as to this claim.

**D.    UDTP**

48.    To state a claim for UDTP under N.C. Gen. Stat. § 75-1.1, a plaintiff must allege that "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton*, 353 N.C. at 656, 548 S.E.2d at 711. A deceptive act or practice is one that has the capacity to deceive. *State ex rel. Cooper v. NCCS Loans, Inc.*, 174 N.C. App. 630, 641, 624 S.E.2d 371, 378 (2005). "In essence, an unfair act or practice is one in which a party engages in conduct which amounts to an inequitable assertion of its power or position." *Se. Shelter Corp.*, 154 N.C. App. at 330, 572 S.E.2d at 206. "North Carolina case law has held that conduct which constitutes a breach of fiduciary duty and constructive fraud is sufficient to support a UDTP claim." *Compton v. Kirby*, 157 N.C. App. 1, 20, 577 S.E.2d 905, 917 (2003).

49.    Regarding Plaintiff's breach of fiduciary duty and constructive fraud claims, Defendants' sole argument for dismissal is that Plaintiff has failed to adequately allege the existence of a fiduciary relationship. (Defs.' Br. Supp. 12; Defs.' Reply Br. 9.) Having found that Plaintiff has sufficiently alleged the existence of a fiduciary relationship to survive a Rule 12(b)(6) motion, the Court concludes at this early stage of the proceeding, and subject to later review on a more developed record, that the allegations of the First Amended Complaint are sufficient to state a UDTP claim. Accordingly, the Motion is denied as to Plaintiff's UDTP claim.

**E.     Punitive Damages**

50.     The Motion also seeks dismissal of Plaintiff's request for punitive damages on the ground that Plaintiff has not stated a valid underlying claim to support a punitive damages award.  (Defs.' Br. Supp. 18–19.)

51.     Pursuant to N.C. Gen. Stat. § 1D-15(a), punitive damages may be awarded only if Plaintiff proves that Defendants are liable for compensatory damages and that either fraud, malice, or willful or wanton conduct was present and related to the injury for which compensatory damages were awarded.  *See Carcano v. JBSS, LLC*, 200 N.C. App. 162, 179, 684 S.E.2d. 41, 54 (2009).  Punitive damages may be awarded for constructive fraud or breach of fiduciary duty.  *Collier v. Bryant*, 216 N.C. App. 419, 434, 719 S.E.2d 70, 82 (2011); *BDM Invs. v. Lenhil, Inc.*, 2014 NCBC LEXIS 6, at *50 (N.C. Super. Ct. Mar. 20, 2014).

52.     The Court has concluded that Plaintiff has sufficiently stated claims for constructive fraud and breach of fiduciary duty.  As these claims may serve as a basis for an award of punitive damages, the Motion is denied as to Plaintiff's request for punitive damages.

## V.     CONCLUSION

53.     For the foregoing reasons, the Court **DENIES** Defendants' Motion.

**SO ORDERED**, this the 25th day of January, 2018.

/s/ Michael L. Robinson
_____
Michael L. Robinson
Special Superior Court Judge
    for Complex Business Cases